483 F.2d 1126
 9 Empl. Prac. Dec. P 10,167
 Thomas DWEN, as President of the Suffolk County Patrolmen's
Benevolent Association and Thomas Dwen,
Individually, Plaintiff-Appellant,
v.
John L. BARRY, Commissioner of the Suffolk County Police
Department, Defendant-Respondent.
 No. 862, Docket 72-1037.
 United States Court of Appeals,
Second Circuit.
 Argued June 14, 1973.
Decided Aug 22, 1973.
 
 Leonard Wexler, Smithtown, N.Y. (Richard T. Haefeli, Smithtown, N.Y., of counsel), for plaintiff-appellant.
 Patrick A. Sweeney, Northport, N.Y. (George W. Percy, Suffolk County Atty., Riverhead, N.Y., of counsel), for defendant-respondent.
 Before KAUFMAN, Chief Judge, SMITH, Circuit Judge, and BRYAN,* District Judge.
 J. JOSEPH SMITH, Circuit Judge:
 
 
 1
 This is an appeal from denial of preliminary injunction and summary dismissal by the United States District Court for the Eastern District of New York, Jacob Mishler, Chief Judge, 336 F.Supp. 487, of a civil rights action brought by Dwen, individually and as president of the Suffolk County Patrolmen's Benevolent Association, seeking to invalidate hair grooming regulations of the Suffolk County Police Department[1] as in violation of the patrolmen's rights under the First and Fourteenth Amendments. We conclude that summary dismissal based on the pleadings and an affidavit submitted by Deputy Commissioner Eugene Kelley was improper. Accordingly, we reverse and remand for trial.
 
 
 2
 The court correctly recognized that the regulation might well raise constitutional issues of the right to free expression, due process and equal protection if applied to other than uniformed personnel, but analogized the uniformed force to the military and sustained the regulations. A number of courts have upheld such regulations on similar grounds, terming police organizations as para-military or quasi-military requiring strict discipline and uniformity of appearance, see, e.g., Greenwald v. Frank, 40 A.D.2d 717, 337 N.Y.S.2d 225 (1972), aff'd without opinion, 32 N.Y. 2d 862, 346 N.Y.S.2d 529, 299 N.E.2d 895 (May 30, 1973). See also Stradley v. Anderson, 349 F.Supp. 1120 (D.Neb. 1972), aff'd 478 F.2d 188 (8th Cir., May 17, 1973); Doyle v. Kammeraad, 310 Mich. 233, 17 N.W.2d 165 (1943); Fraternal Order of Police v. Harris, 306 Mich. 68, 10 N.W.2d 310 (1943); People ex rel. Masterson v. French, 110 N.Y. 494, 499, 18 N.E. 133 (1888).
 
 
 3
 Central to each of the "para-military" cases is the singular position afforded the military, Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); see Hagopian v. Knowlton, 470 F.2d 201, 204 (2d Cir. 1972), and the concept that those in the armed forces are deemed to surrender many important rights. "[T]he armed services, their officers and their manner of discipline do serve an essential function in safeguarding the county. The need for discipline, with the attendant impairment of certain rights, is an important factor in fully discharging that duty." Raderman v. Kaine, 411 F.2d 1102, 1104 (2d Cir.), cert. dismissed, 396 U.S. 976, 90 S.Ct. 467, 24 L.Ed.2d 447 (1969).
 
 
 4
 Extension to the uniformed civilian services of the police and fire departments of the unique judicial deference accorded to the military, however, seems to us not warranted. While these services have been characterized as para-military organizations,[2] see Doyle v. Kammeraad, supra; Fraternal Order of Police v. Harris, supra; Greenwald v. Frank, supra; People ex rel. Masterson v. French, supra, the characterization is hardly justified either historically or functionally.
 
 
 5
 The civilian police force is a relatively recent development. It arose out of the need to supplement the private citizen's role in keeping the peace.[3] Any "paramilitarism" of the force stems not from its origin nor from the nature of its duty but from the adoption of an organization with a centralized administration and a disciplined rank and file for efficient conduct of its affairs.[4] The use of such organization evolved as a practical administrative solution and not out of any desire to create a military force.[5] See R. Fosdick, American Police Systems ch. 2 (1920); W. Lee, A History of Police in England (1901) (1971 ed.). The police force remains significantly different in character from the military. It is still locally controlled and organized, see N.Y. Unconsol. Laws Sec. 5721, and subject to more direct control of the electorate, N.Y. Unconsol. Laws Sec. 5722, Suffolk County Constitution art. XII Sec. 1202(a), (b)(4), (b)(5) and Sec. 1211. Appointment of members of the force is made under Civil Service Regulation. While police officials are given broad discretion in running a department, dismissal of patrolmen is subject to court review. N.Y. Village Law Sec. 8-806 (McKinney N.Y. Unconsol. Laws Sec. 5732); see People ex rel. Hart v. Board of Fire Commissioners, 82 N.Y. 358, 360-61 (1880).
 
 
 6
 Discipline although essential to an effective police force as it is to the military is clearly of a different type.[6] Instant unquestioning obedience has been found essential to a soldier in action and his training and its attendant discipline is designed to develop such obedience. The same type of instant unquestioning obedience is not necessary for an effective police force. See Greenwald v. Frank, supra, 40 A.D.2d 717, 337 N. Y.S.2d at 231-232 (Shapiro, J. dissenting); cf. Orloff v. Willoughby, supra, 345 U.S. at 94, 73 S.Ct. 534, 97 L.Ed. 842. Rather it has been suggested that the military model of organization and discipline must not be followed too closely as a policeman unlike a soldier frequently acts individually on his own initiative and not subject to the immediate supervision of his superiors. See W. Lee, A History of Police in England at 401-402.
 
 
 7
 This is not to say, however, that the special nature of the police officer's duties and the recognized need to maintain a singular degree of discipline are immaterial. These factors are relevant to the determination of the validity of the General Order bearing not on the nature of plaintiff's rights, but on the existence of a legitimate state interest to be reasonably advanced by the regulation.[7] A policeman does not, however, waive his right to be free from arbitrary and unjustifiable infringement of his personal liberty when he elects to join the force.[8] See Garrity v. New Jersey, 385 U.S. 493, 499-500, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967); Muller v. Conlisk, 429 F.2d 901, 904 (7th Cir. 1970).
 
 
 8
 While it has been argued that hair length controversies are much ado about nothing, we think there is a substantial constitutional issue raised by regulation of the plaintiff's hair length. The question is whether the government may interfere with the physical integrity of the individual and require compliance with its standard of personal appearance without demonstrating some legitimate state interest reasonably requiring such restriction on the individual. The first, third, fourth, seventh and eighth circuits have held that the Constitution limits the state's right to regulate the personal appearance of its citizens.[9] We agree. See Olff v. East Side Union High School District, 404 U. S. 1042, 92 S.Ct. 703, 30 L.Ed.2d 736 (Douglas, J., dissenting from denial of certiorari).
 
 
 9
 An increasing number of courts have recognized the right of the individual to style his own appearance, but there has been little consensus on the source of constitutional protection. The right has been found in the First Amendment, Arnold v. Carpenter, 459 F.2d 939 (7th Cir. 1972); the Ninth Amendment, Bishop v. Colaw, 450 F.2d 1069 (8th Cir. 1971); the Equal Protection Clause of the Fourteenth Amendment, Massie v. Henry, 455 F.2d 779 (4th Cir. 1972), and the due process guarantees of the Fifth and Fourteenth Amendments, Stull v. School Board of the Western Beaver Junior-Senior High School, 459 F.2d 339 (3rd Cir. 1972); Richards v. Thurston, 424 F.2d 1281 (1st Cir. 1970); Massie v. Henry, supra.
 
 
 10
 We may well base the right on the guarantee under the Due Process Clause of personal liberty of "a rational continuum which, broadly speaking, includes a freedom from all substantial arbitrary impositions and purposeless restraints. . . ." Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1777, 6 L. E.2d 989 (1961) (Harlan, J., dissenting). Cf. Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 726, 35 L.Ed.2d 147 (1973); Rochin v. California, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). Personal liberty is not composed simply and only of freedoms held to be fundamental but includes the freedom to make and act on less significant personal decisions without arbitrary government interference. Limitation of such a right requires some showing of public need.
 
 
 11
 We hold only that choice of personal appearance is an ingredient of an individual's personal liberty, and that any restriction on that right must be justified by a legitimate state interest reasonably related to the regulation. Here the department has failed to make the slightest showing of the relationship between its regulation and the legitimate interest it sought to promote. The sole presentation by the department was the affidavit submitted by Deputy Commissioner Kelley. That affidavit commented only that the regulation was directed at both uniformed and non-uniformed officers, it was silent on the question of the necessity for the regulation in maintaining discipline. In the absence of the requisite justification by the department, dismissal of the complaint under Rule 12(b)(6) was in error. Nor would summary judgment on the affidavit submitted be justified since a genuine issue was presented for trial. We imply no views on the merits. We indicate simply that, at trial the Commissioner has the burden of establishing a genuine public need for the regulation.
 
 
 12
 Reversed and remanded.
 
 
 
 *
 Of the United States District Court for the Southern District of New York, sitting by designation
 
 
 *
 ORDER NUMBER 71-1 AMENDING
 RULES AND PROCEDURES
 POLICE DEPARTMENT, COUNTY OF
 SUFFOLK, N.Y.
 
 
 X
 GENERAL
 SPECIAL
 PERSONNEL ORDER DATE
 NUMBER 19
 71-1 July
 1971
 AUTHORITY Police Commissioner
 SIGNATURE OF AUTHORITY JOHN
 
 
 L
 BARRY
 Effective 0001 hrs. 1 August,
 1971 Chapter 2 of the Rules
 & Procedures is amended by
 the addition of the
 following section:
 2/75.0 Members of the Force and Department shall be
 neat and clean at all times while on duty.
 Male personnel shall comply with the following
 grooming standards unless excluded by the
 Police Commissioner due to special assignment:
 2/75.1 HAIR: Hair shall be neat, clean, trimmed, and
 present a groomed appearance. Hair will not
 touch the ears or the collar except the
 closely cut hair on the back of the neck. Hair
 in front will be groomed so that it does not
 fall below the band of properly worn headgear.
 In no case will the bulk or length of the hair
 interfere with the proper wear of any
 authorized headgear. The acceptability of a
 member's hair style will be based upon the
 criteria in this paragraph and not upon the
 style in which he chooses to wear his hair.
 2/75.2 SIDEBURNS: If an individual chooses to wear
 sideburns, they will be neatly trimmed and
 tapered in the same manner as his haircut.
 Sideburns will not extend below the lowest
 part of the exterior ear opening, will be of
 even width (not flared), and will end with a
 clean-shaven horizontal line.
 2/75.3 MUSTACHES: A short and neatly trimmed mustache
 may be worn, but shall not extend over the top
 of the upper lip or beyond the corners of the
 mouth.
 2/75.4 BEARDS & GOATEES: The face will be clean-shaven
 other than the wear of the acceptable mustache
 or sideburns. Beards and goatees are
 prohibited, except that a Police Surgeon may
 grant a waiver for the wearing of a beard for
 medical reasons with the approval of the
 Police Commissioner. When a Surgeon prescribes
 that a member not shave, the beard will be
 kept trimmed symmetrically and all beard hairs
 will be kept trimmed so that they do not
 protrude more than one-half inch from the skin
 surface of the face.
 2/75.5 WIGS: Wigs or hair pieces will not be worn on
 duty in uniform except for cosmetic reasons to
 cover natural baldness or physical
 disfiguration. If under these conditions, a
 wig or hair piece is worn, it will conform to
 department standards.
 
 
 [2]
 "The government of a police force assimilates to that required in the control of a military body. . . ." People ex rel. Masterson v. French, supra 110 N.Y. 494, 500, 18 N.E. 133, 135 (1888)
 
 
 [3]
 "The Anglo-Saxon police tradition . . . springs from a configuration of attitudes which were profoundly suspicious of central authority and hostile to the idea of guarding the local peace with militia." Taft & England, Criminology, 317, 318 (4th ed. 1964); see also Hall, Legal and Social Aspects of Arrest Without Warrant, 49 Harv.L.Rev. 566, 579 (1936); Hall, Police and Law in a Democratic Society, 28 Ind.L. Rev. 133, 135-37 (1953)
 
 
 [4]
 Clearly distinct from the continental tradition of a police system which was part of the military establishment under the control of the central state, the Anglo-Saxon police system in England, followed in the United States, developed from a system of local property owners responsible for keeping the peace in their own towns or villages. Statute of Winchester, 13 Edw. 1, Sec. 2 (1285). See 49 Harv.L.Rev. 580-83; 28 Ind.L.Rev. at 135. Creation of a separate police force in London in 1829 was accomplished only after fear of an armed militia to be used against the liberty of citizens was overcome. See 49 Harv.L.Rev., supra, n. 3 at 587-90. W. Lee, A History of Police in England at 248
 New York the first to follow the English, example, replaced its separately organized systems of night and day watchmen which were comprised generally of otherwise employed men, with a force of 800 men under a police chief. The force was un-uniformed, undisciplined and essentially political. Members were appointed for one year by local aldermen. The history of the force throughout the nineteenth century makes clear that there was no intention to create a civilian military. See R. Fosdick, American Police Systems at 109-10 (1920). The discipline as it exists today was a late development in the force.
 
 
 [5]
 Police are given the powers of a constable. N.Y. Village Law Sec. 8-802 (McKinney's Consol.Laws, c. 64) used under reference from N.Y. Unconsol.Laws Sec. 5732; Suffolk Constitution art. XII Sec. 1208. See N.Y. Town Law McKinney's Consol.Laws, c. 62, Sec. 39
 
 
 [6]
 At issue in Masterson, see n. 2, and similar New York cases was the propriety of the dismissal of the patrolmen from the force for such malfeasance as negligent homicide or appearing on duty while intoxicated. There is little similarity between the disciplinary questions in these cases and Order No. 71-1 which the district court apparently found designed to inculcate discipline
 
 
 [7]
 See, e. g., Lindquist v. City of Coral Gables, 323 F.Supp. 1161 (S.D.Fla.1971)
 
 
 [8]
 However, with the exception of Hunt v. Board of Fire Commissioners of Massapequa Fire District, 68 Misc.2d 261, 327 N.Y. S.2d 36 (1971), the New York courts have sustained the validity of grooming regulations for firemen and policemen. See Olszewski v. Council of Hempstead Fire Department, 70 Misc. 603, 334 N.Y.S.2d 504, 506 (Sup.Ct.1972) (based on a showing of safety needs); Austin v. Howard, 39 A.D.2d 76, 332 N.Y.S.2d 434 (1972) (upheld suspension of fireman for failure to wear proper boots)
 The Court of Appeals affirmed without opinion an order upholding the regulations at issue here, in a case brought by a Nassau County policeman. Greenwald v. Frank, 32 N.Y.2d 862, 346 N.Y.S.2d 529, 299 N.E. 2d 895 (May 30, 1973). The New York Supreme Court had recognized that a policeman has a constitutional interest in determining his own appearance but found that interest outweighed by the "powerful countervailing interest" of the police department and the general public. 70 Misc.2d 632, 639, 334 N.Y.S.2d 680, 688 (Sup.Ct.1972). The Appellate Division while affirming the order held that the appeal failed to raise substantial constitutional issues. Its affirmance was based on a finding that "there should be neatness and discipline in a large quasimilitary organization such as the Nassau County Police Department. . . ." 40 A.D.2d 717, 337 N.Y.S.2d at 225.
 
 
 [9]
 Several district courts in this circuit have so ruled. In Seale v. Manson, 326 F.Supp. 1375 (D.Conn.1971) the court held that a prisoner's choice of hair length and facial hair is a personal liberty protected by due process and that without evidence supporting the prison's rationale for prohibiting beards and goatees a prisoner could not be forced to shave
 A school's regulation of hair style was held to be violative of a substantial right of the student where no compelling state interest was shown for the regulation. See Dunham v. Pulsifer, 312 F.Supp. 411 (D. Vt.1970); but see Crossen v. Fatsi, 309 F. Supp. 114, 118 (D.Conn.1970).
 A military prohibition on the wearing of short-haired wigs, admittedly neat and conforming to Army appearance requirements and not interfering with the proper execution of a reservist's duty was held an abuse of discretion and an unjustifiable interference with the right of the reservist to wear long hair in off-duty hours. Harris v. Kaine, 352 F.Supp. 769 (S.D.N.Y.1972).
 While these cases and many of those in the other circuits have not concerned uniformed police and fire departments, the basic issue remains the same-the right of the state to impose standards of hair styling. The different status of the individual raising the claim bears on the question of whether the right is outweighed by a legitimate state interest.