Neal O'DOHERTY, as President of Correction Officers Benevolent Association, County of Nassau, New York Incorporated and Neal O'Doherty, Individually, Plaintiff,

v.

Michael P. SENIUK, Sheriff, County of Nassau, New York and Nassau County Sheriff's Department, Defendants.

No. 74 C 404.

United States District Court, E. D. New York.

Feb. 18, 1975.

McCabe & Huschle, Rockville Centre, N. Y., for plaintiff by Joseph A. McCabe, Rockville Centre, N. Y.

John F. O'Shaughnessy, County Atty. of Nassau County, Mineola, N. Y., for defendants by Louis Schultz, and Vincent M. Esposito, Mineola, N. Y.

## MEMORANDUM OF DECISION AND ORDER

NEAHER, District Judge.

This civil rights action for declaratory and injunctive relief [1] seeks to invalidate and enjoin the enforcement of hairgrooming regulations, Sheriff's Order No. 33, of the Sheriff's Department, County of Nassau, New York, dated November 1, 1971, as in violation of plaintiff's constitutional rights. Following the issuance of a temporary restraining order which enjoined the defendants from enforcing the regulations, a consolidated hearing for preliminary and permanent injunctive relief, Rule 65(a)(2), F.R.Civ.P., was held on the merits. The parties consented to continued extension of the restraining order pending this court's decision.

1. Plaintiff also seeks nominal compensation and punitive damages in the amount of $1.00. Compl. at p. 3.

Final decision of this case was held in abeyance in view of a pending appeal before the Second Circuit in Dwen v. Barry, 71 C 1020 (E.D.N.Y., May 30, 1974) (Mishler, Ch. J.), of an order granting similar relief against a grooming regulation substantially identical to the one in question here.[2] On January 9, 1975, the Second Circuit afffirmed Chief Judge Mishler's decision in open court, undoubtedly relying on its earlier extended discussion of the case, 483 F.2d 1126 (reversing for trial the denial of a preliminary injunction and summary dismissal of the action). The Court of Appeals there stated what must be regarded as the controlling standard of review for the subsequent trial and this case as well:

"We hold only that choice of personal appearance is an ingredient of an individual's personal liberty, and that any restriction on that right must be

2. That regulation, applicable to the Police Department, County of Suffolk, New York, is set forth in Dwen v. Barry, 483 F.2d 1126, 1127 n. 1 (2 Cir. 1973). Chief Judge Mishler's final decision in the case reveals that the regulations were substantially amended, Memorandum of May 30, 1974 at 2 n. 1, but that fact is of no particular significance to the standards applicable to this case. In any event, the change works to plaintiff's advantage: it was clearly a liberalization of the earlier regulation and was nonetheless invalidated. The instant regulation is as follows:

### "SHERIFF'S DEPARTMENT

### "COUNTY OF NASSAU, NEW YORK

"SHERIFF'S ORDER                     NOVEMBER 1, 1971
NUMBER 33

### "PERSONAL APPEARANCE

"Effective November 8, 1971—0001 hours
"Members of the Sheriff's Department shall be neat and clean at all times while on duty.

### "HAIR

"Hair shall be neat, clean, trimmed and present a groomed appearance. Hair will not touch the ears or the collar except the closely cut hair on the back of the neck. Hair in front will be groomed so that it does not fall below the band of properly worn headgear. In no case will the bulk or length of the hair interfere with the proper wear of any authorized headgear. The acceptability of a member's hair style will be based upon the criteria in this paragraph and not upon the style in which he chooses to wear his hair.

### "SIDEBURNS

"If an individual chooses to wear sideburns, they will be neatly trimmed and tapered in the same manner as his haircut. Sideburns will not extend below the lowest part of the exterior ear opening, will be of even width (not flared), and will end with a clean-shaven horizontal line.

### "MUSTACHES

"A short and neatly trimmed mustach may be worn, but shall not extend over the top of the upper lip or beyond the corners of the mouth.

### "BEARDS AND GOATEES

"The face will be clean-shaven other than the wear of the acceptable mustache or sideburns. Beards and goatees are prohibited, except that a waiver for the wearing of a beard for medical reasons may be granted with the approval of the Sheriff. If approval is granted, beards will be kept trimmed symmetrically and all beard hairs will be kept trimmed so that they do not protrude more than one-half inch from the skin surface of the face.

### "WIGS

"Wigs or hair pieces will not be worn on duty in uniform except for cosmetic reasons to cover natural baldness or physical disfiguration. If under these conditions, a wig or hair piece is worn, it will conform to department standards." (Exh. A to Compl.)

justified by a legitimate state interest reasonably related to the regulation." *Id.* at 1130.

The court also noted that, at trial, the defendants would have "the burden of establishing a genuine public need for the regulation," *id.* at 1131, and would have to demonstrate "the relationship between [the] regulation and the legitimate interest it sought to promote." *Id.* Based on those standards, and for the reasons which follow, constituting the findings and conclusions required by Rule 52(a), F.R.Civ.P., this court is satisfied that plaintiff is entitled to the injunctive and declaratory relief requested.

In their post-trial memorandum, defendants advance three alleged legitimate State interests: (1) the need for discipline in a jail environment; (2) the need to ensure safety in the jail environment; and (3) the need to promote, by conduct and example, the rehabilitation of inmates. These interests, and their relationship to the grooming regulation, are not conceded by plaintiff, but plaintiff has chosen to emphasize instead his belief that the motivations underlying the enforcement of the regulation were improper. Defendants dispute this and the evidence, even assuming its relevance, is by no means clear either way. Accordingly, the findings and conclusions below are based upon the lack of an adequate showing of a reasonable relationship between the regulation and the legitimate State interests relied on. The court expresses no opinion as to the merit of plaintiff's allegations of improper motivation, except to note that they have been neither proved nor disproved.

### 1. *Jail discipline*

Relying on Stradley v. Andersen, 478 F.2d 188, 190 (8 Cir. 1973), defendants point to the testimony of defendant Seniuk as demonstrating that because of "the necessary regimentation and its

attendant security in a close jail environment . . . there is an even greater need for discipline within the Correction Officer field than within the Police Department field." Defendants' Memorandum of Law at 4.

■■ This court can find no basis for disagreement with defendants' conclusion that jail discipline is a legitimate State interest that may be advanced. In fact, Dwen v. Barry supports such a view, 483 F.2d at 1129. But that case also makes it quite clear that the mere statement of such an interest is not enough: "extension to the uniformed civilian services of the police and fire departments of the unique judicial deference accorded to the military, however, seems . . . [un]warranted." *Id.* at 1128. The court is satisfied, on the record before it, that the Nassau County Sheriff's Department, whose members' principal role appears to be that of correctional officers at the Nassau County Jail, is not so distinguishable from the civilian police as to be entitled to exemption from the *Dwen* rule, which requires that defendants establish a relationship between the interest in jail discipline and the grooming regulation.

Turning to defendants' evidence on that point, its sole witness was the defendant Seniuk. About all he had to say concerning this was that he had "noticed a general letdown and slackness on the part of the Correction Officers" (Tr. 22, June 4, 1974),[3] and, concerned about maintaining security, control and safety at the Nassau County Jail, he obstensibly decided to enforce the grooming regulation "technically" for the "general good and safety of the Nassau County Jail." (Tr. 23, June 4, 1974). See also *id.* at 52. While this tends to establish that defendants' motivation may not have been improper it falls far short of showing any connection between jail discipline and the regulation in question.[4] Defendants'

---

3. "Tr. ——" refers to the official court transcript of the hearing in this case.

4. See also n. 10, *infra.*

claim in this regard simply must fail for an entire lack of proof.

### 2. *Jail Safety*

What has been said above about jail discipline seems equally applicable here. This court will not quarrel with the legitimacy of a public need for orderliness and safety in the management of a jail. Hairgrooming regulations have been upheld, as defendants point out, as applied to fire department personnel when a showing is made that long hair might otherwise interfere with the functioning of frequently used gas masks, or that other safety considerations are present. That was clearly the case in a recent decision by Judge Costantino of this district, Kamerling v. O'Hagan, 74 C 1061 (E.D.N.Y., July 24, 1974), as well as in Yarbrough v. City of Jacksonville, 363 F.Supp. 1176 (M.D.Fla.1973), cited by defendants. Defendants' misapprehension of the burden placed upon them is evident by their reliance on these cases, when there is absolutely no evidence concerning the need for and use of gas masks in the Nassau County Jail or any interference with their use if an individual did not comply with the challenged regulation. See McCune v. Frank, 74 C 1279, Memorandum of Decision (E.D.N.Y., December 13, 1974) (Mishler, Ch. J.); cf. Ammirati v. Metropolitan Commuter Transporation Authority, 73 C 1888 (E.D.N.Y., January 18, 1974) (Costantino, J.).

The only real suggestion of a safety justification for the regulation was adverted to on cross-examination of plaintiff,[5] who had testified on direct examination that he had been held in violation of the Sheriff's Order. The court's own observation and recollection was that plaintiff and each of the other correctional officer witnesses wore their hair neat, well groomed and hardly of a length which could provide a jail inmate, reaching through the bars of his cell, with a sure grip. Nor was any evidence to the contrary offered by defendants.[6] Indeed, the court would have been unable to find, as did Chief Judge Mishler in *Dwen,* that the most that was proven was "that pony tails present a hazard to law enforcement officers and are a proper subject for regulation." *Dwen v. Barry, supra,* Memorandum of May 30, 1974, at 3.

Moreover, perusal of the regulations themselves, in addition to the court's inspection of the many correctional officers called as witnesses who were cited by the Sheriff as in violation of his order, compels the conclusion that the regulation is hopelessly overbroad when justification is sought on a safety theory. Whether or not more liberal regulations could be promulgated in the name of safety need not be decided now. Suffice it to say that there is no proof of a connection between the legitimate interest in jail safety and the regulation in question.

### 3. *The Rehabilitative Effect of Exemplary Conduct*

The most seriously contested justification for the grooming regulation was

---

5. See Tr. 30–35 (April 12, 1974). In fact, this line of defense was even further discredited by subsequent testimony of plaintiff, *id.* at 43–46, and another of plaintiff's witnesses, Correction Sergeant John J. Fenton, who testified that in his 14 years at the jail he had never heard of a correctional officer's being grabbed by the hair by an inmate. *Id.* at 65.

6. This is so, despite a specific inquiry by the court of defense counsel, requesting the details of several incidents of assaults by inmates on correctional officers in January 1974 mentioned in defendant Seniuk's testimony, in the hope this might show a connection between the attacks and the grooming standards of the men. The Sheriff testified these attacks were part of the reason for his sudden strict enforcement of the regulations (Tr. 51–55. June 4, 1974). The subsequently produced reports reveal no such connection, nor do defendants seek to rely on them. To the extent they are typical, they reveal isolated outbreaks of inmate violence, efforts by correctional officers to subdue them, and injuries typical of such an encounter—those caused to the body by the kicking, striking and scratching by an inmate.

its rehabilitative effect on prisoners. Sheriff Seniuk's testimony on the three interests advanced here, when reduced to its essentials, amounts to a claim that the need is great for the correctional officers to set a good example for the inmates. The Sheriff testified at length that the philosophy of rehabilitation by exemplary conduct underlay the grooming regulation.[7] In this regard, the same grooming standards apply to the sentenced inmates,[8] although the regulations are incorporated in a separate order—Sheriff's Order No. 25.[9]

It was brought out at the hearing, and bears repeating here, that Order No. 25 has been the subject of prior constitutional litigation. Judge Bartels of this district has found it, insofar as it involves hair-cutting, "a proper internal disciplinary function adopted for sanitary and hygienic reasons and for protection of the inmates from potential sexual assaults." Geraci v. Treuchtlinger, 73 C 254, Memorandum at 4 (E.D.N.Y., March 20, 1973), appeal dismissed as moot, 487 F.2d 590 (2 Cir. 1973). While such a finding might not necessarily be binding on this court in this case, it is not disputed. There does not appear to have been any attempt in the Geraci case to justify Order No. 25 on a rehabilitative goal interest, just as there is no evidence in this case seeking to justify Order No. 33 for sanitary and hygienic reasons.

There can be no doubt that rehabilitation of sentenced inmates is a legitimate, even compelling, State interest. Thus the court is asked to decide whether this legitimate interest is reasonably related to a regulation previously upheld as applied to the inmates on the basis of a wholly different interest.

To begin with, it cannot, and is not, seriously disputed that the example the jailer sets for the jailed may well affect the latter's progress toward an acceptable norm of behavior. But surely there are rules regulating inmate conduct which, if applied to the correctional officers, would neither enhance nor diminish inmate rehabilitation. For example, inmates might, for valid reasons, be required to surrender articles of personal adornment, such as rings,

---

7. Some of his more pertinent testimony on this point is set forth below:

"A jail is a structured environment. It's a therapeutic setting. (Tr. 10, June 4, 1974.)

\* \* \* \* \*

"The good-grooming [rule] sets [an] example. How are you going to teach someone as far as rehabilitation is concerned if you yourself don't practice what you preach as far as setting an example about good-grooming, about total dedication, about loyalty and about operating the Nassau County Jail. That is part of the philosophy and background in the good-grooming rule. (Id. at 11.)

\* \* \* \* \*

"[The manner in which a correction officer is attired, the manner in which his hair is groomed or not groomed] certainly has a salutary effect. The inmate in the Nassau County Jail is there because he couldn't cope with the situation, couldn't conform. We have in—the average stay in the Nassau County Jail is forty days. These are society's failures. We can't bring miracles. We try to inculcate in this [time] good health habits, work habits, neatness and tidiness, good grooming, good appearance.

"These are the basics, fundamentals, hopefully as they start in the right direction when they are released from our institution." (Id. at 15–16.)

The Sheriff also pointed out that the minimum age of prisoners at the jail is 16 and that over half of the inmates are between the ages of 16 and 25. He agreed that the grooming regulations "would go a great distance" toward teaching and correcting these youthful inmates. Id. at 16. See also Deposition of defendant Seniuk, March 28, 1974, at 8–10, 19–25, 28, 32–36 (in evidence as Pltf.'s Exh. 3).

8. A "sentenced inmate," according to the Sheriff, is to be distinguished from a "detainee." He testified that on June 3, 1974, there were 478 inmates in the jail, only 245 of whom "had been sentenced by a court of competent jurisdiction." (Tr. 10, June 4, 1974).

9. The order is attached as Exhibit C to the O'Doherty Affidavit submitted on the Motion for a Temporary Restraining Order. In it plaintiff agrees that Order No. 25 sets forth "substantially the same" standards as does Order No. 33. O'Doherty Aff. ¶ 5. It also appears undisputed on the whole record that those standards are not applied to the detainees. See id. at ¶ 6.

bracelets or watches, while in custody. Such reasons would not normally apply to the officers, and to suggest that an officer subject himself to the same rule in order to enhance inmate rehabilitation would be patently absurd. Common sense dictates that an inmate understands that the behavioral rules applicable to him in a custodial environment need not be visited with equal force upon his custodians; it is an elementary corollary to his awareness of his loss of freedom.

Then again, there are rules which, if applied to the correctional officers, obviously would enhance rehabilitation. A good example would be the requirement, as contained in Sheriff's Order No. 33, that "Members of the Sheriff's Department shall be neat and clean at all times while on duty." Analytically, however, Order No. 33, when considered as a whole, falls into a less obvious area squarely between the wearing of personal adornments and the neatness and cleanliness implicit in good grooming. As noted, there are portions of it which, standing alone, would be acceptable. However, to sustain it in its entirety under this theory is impossible, when, under Dwen v. Barry, *supra,* the Second Circuit has held substantially the same regulations to involve primarily restriction of "an individual's personal liberty," namely, his "choice of personal appearance." 483 F.2d at 1130.

An obvious example of its deficiencies was apparent from the court's own observation of several correctional officers cited for violations of the Order, whose appearance on the stand was extremely impressive in terms of standards of neatness and cleanliness that an inmate might look to as an example. How could it be said that an officer's "neatly trimmed mustach [*sic*]" is counterproductive of rehabilitation sim-

ply because it extends slightly "over the top of the lip or beyond the corners of the mouth"? See n. 2 *supra.* On cross-examination Sheriff Seniuk was asked if he were aware of any academic authorities in the field of penology which addressed themselves to this sort of question. He was not (Tr. 59–62, June 4, 1974). On the whole record, the court is compelled to conclude that defendants have failed to demonstrate a reasonable relationship between the asserted rehabilitative interest and the regulation when considered in its entirety.[10]

Although the court is convinced that plaintiff is entitled to the requested equitable relief, he is by no means obviously so. This case, as defendants correctly point out, presents quite different considerations from those involving a police force that deals primarily with the public. McCune v. Frank, *supra;* Dwen v. Barry, *supra.* There may well be some reasonable limitations that may be placed upon the personal appearance of correctional officers who fill a unique role of "custody, control and care" (Tr. 18, April 12, 1974) of sentenced inmates and detainees, many of whom are youthful and no doubt good subjects for enlightened rehabilitative efforts. This court holds only that Sheriff's Order No. 33, as presently constituted, cannot be sustained as reasonably related to the legitimate State interests presented.

Finally, we note our agreement with Chief Judge Mishler that proper grooming and standards of personal appearance are "an ingredient of the esprit de corps of a good law enforcement organization." Dwen v. Barry, *supra,* Memorandum at 4. See also McCune v. Frank, *supra,* Memorandum at 10. Proper standards may well serve to generate self-esteem in each correctional officer

10. Defendants' rehabilitation argument here overlaps with its jail discipline theory, *supra* p. 458. The interest in seeking compliance with Sheriff's Order No. 25, applicable to inmates, and thereby fostering a climate of discipline and compliance with all jail rules, is certainly a legitimate one. Arguably it is advanced by not overlooking violations of a similar rule applicable to correctional officers. Indeed, there is some evidence to support this in the record (Tr. 55–56, June 4, 1974). But this is not to say that the standards must be identical. Such a theory again ignores the inmate's implicit awareness that his loss of freedom may impose some burdens on him that it does not upon his jailers.

and respect from the inmates, and to promote the efficiency of the Nassau County Sheriff's Department. But standards which unduly infringe personal liberty without substantial justification, and which appear to promote technical, if not punitive, citations of violation among obviously well-groomed, competent and dedicated career officers, have no place in our municipal, State or federal governmental units.

Accordingly, judgment is granted in favor of plaintiff and against defendants declaring Sheriff's Order No. 33 of the Nassau County Sheriff's Department unconstitutional, void and of no effect and permanently enjoining the defendants from enforcing Sheriff's Order No. 33.[11]

Settle judgment in accordance with this decision and order on two days notice.

So ordered.

11. The court finds no basis for an award of nominal compensation or punitive damages.