Donald F. ROMANO, Plaintiff,

v.

William E. KIRWAN, Superintendent of
the New York State Police,
Defendant.

Civ. No. 1973–629.

United States District Court,
W. D. New York.

March 4, 1975.

Rocco D. Potenza, Buffalo, N.Y. (Christian G. Koelbl III, and Michael J. Hutter, Buffalo, N.Y., of counsel), for plaintiff.

Louis J. Lefkowitz, Atty. Gen. of N. Y. (Douglas S. Cream, Asst. Atty. Gen., Buffalo, N.Y., of counsel), for defendant.

Before TIMBERS, Circuit Judge, CURTIN, Chief District Judge, and BURKE, District Judge.

CURTIN, Chief District Judge.

Plaintiff, a New York state policeman holding the rank of trooper, commenced this action under 28 U.S.C. §§ 1331(a) and 1343(3) alleging the unconstitutionality of the regulation setting standards for state police personal grooming, Section 4.18 of Part III of the New York State Police Manual.[1] After this court granted plaintiff's motion for the convening of a three-judge court, Romano v. Kirwan, Civil No. 1973–629 (W.D.N.Y. Apr. 24, 1974), testimony was heard on May 29, 1974. On June 20, 1974 the three-judge court heard oral argument on defendant's motion to dismiss the complaint. The following constitutes the single judge's findings of fact and the panel's conclusions of law drawn from those facts.

■ Defendant makes several preliminary arguments which are without merit. The first is that plaintiff lacks standing. He is a New York state policeman subject to Section 4.18 and disciplinary proceedings for his alleged noncompliance are currently pending. The "threatened or actual injury" standard is clearly met. *See* Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968);

Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ Defendant also argues that plaintiff must be required to exhaust his administrative remedies, but exhaustion is excused because the challenge would be to the very person who promulgated the challenged regulation, and therefore would "certainly or probably" be a futile gesture. Eisen v. Eastman, 421 F.2d 560, 569 (2d Cir. 1969).

■ Defendant argues that plaintiff has waived his right to bring this action because the Police Benevolent Association of the New York State Police, Inc. [PBA], the collective bargaining unit for the New York state police, has approved the challenged regulation. It is argued that the approval contained in a letter dated May 18, 1972 from William A. Thompson, President of the PBA (Exhibit 10), constitutes a waiver of plaintiff's rights under the standard set forth in D. H. Overmyer Co. v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972). In that case the Supreme Court provided that an individual may waive a constitutional right by contract if the waiver was "voluntary, knowing, and intelligently made . . . or 'an intentional relinquishment or abandonment of a known right or privilege,' . . . ." 405 U.S. at 185–86, 92 S.Ct. at 782. Defendant has failed to prove a waiver under the above standard.

■■ Finally, defendant asserts that this is a proper case for the doctrine of abstention. Abstention should not be applied where there is no uncertainty or ambiguity in the state statute which might be clarified by state interpreta-

---

1. Section 4.18 provides as follows:

All members, both Uniform and Bureau of Criminal Investigation, shall adhere to these guidelines and criteria. Members may be excluded from these limitations by Troop or Detail Commanders when special assignments require deviation.

a. Hair will be neatly groomed and tapered and will not fall over the ears or eyebrows or touch the collar except for the closely cut hair at the back of the neck. The bulk or length of hair will not interfere with the normal wearing of all emergency or Division headgear.

b. Sideburns will be neatly trimmed and will not be of the muttonchop or flared type. The base of the sideburns will be clean-shaven on a horizontal line and shall not extend below the lowest part of the exterior ear opening.

c. The face will be clean-shaven except that mustaches will be permitted. If worn, mustaches will be kept neatly trimmed and shall not extend beyond the corners of the mouth nor fall below the center line of the lips.

tion. *See, e. g.,* Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed. 2d 515 (1971). Further, there are no special circumstances here to justify the delay and additional expense derived from application of the abstention doctrine. Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed. 2d 257 (1972).

■ Turning to the merits, all counsel agree with the panel that the instant case is controlled by Dwen v. Barry, 483 F.2d 1126 (2d Cir. 1973). The *Dwen* court held that the right of the individual to style his own appearance "is an ingredient of an individual's personal liberty" and is protected by the Due Process Clause of the fourteenth amendment. 483 F.2d at 1130. Thus, "any restriction on [the choice of personal appearance] must be justified by a legitimate state interest reasonably related to the regulation." 483 F.2d at 1130.

■ The state interests advanced in support of Section 4.18 are: safety of the officer in carrying out his duties; a need to foster and maintain discipline among state policemen; and the necessity to present a favorable image in order to obtain public cooperation with the state police.[2] Agreeing that these are all legitimate state interests, the question remains whether the enumerated interests are reasonably related to Section 4.18.

In 1962 the Division of State Police promulgated a regulation which provided that "[i]t shall be the duty of each member of the Division to exercise proper care and give proper attention to his person, clothing and equipment to insure

that he presents a neat, clean and businesslike appearance at all times." Section 8.5 of Part III of the New York State Police Manual. The Executive Committee of the Division of State Police initiated study of this section in 1970. On August 12, 1971 Deputy Chief Inspector of the Division of State Police, R. D. Quick, sent a memorandum to Chief Inspector J. C. Miller suggesting that there existed a need for more specific guidelines relating to personal appearance. Defendant's Ex. 5. Inspector Quick's memorandum was precipitated when he observed Trooper Romano, the plaintiff in this case, at a training class with "an unusual and extreme mustache, sideburns and long hair style." *Id.* In his memo suggesting a need for more specific guidelines relating to personal appearance, the inspector emphasized image and discipline, but did not discuss safety. Inspector A. L. Bardossi made a survey and proposed personal appearance guidelines in a memorandum to Chief Inspector G. L. Infante dated December 3, 1971, which was forwarded to Deputy Superintendent J. C. Miller. Defendant's Ex. 6.[3] In his report Inspector Bardossi commented:

Current hair styles have reached a point that their adoption by Division members, in their more extreme forms, is not acceptable to protecting the image desired by the Division. . . .

The Division is semimilitary in organization and a neat well-groomed appearance is fundamental to inspiring public confidence. In this respect our need to inspire a sense of pride and self-discipline in our members closely parallels those of the military.

2. During the trial, the defendant presented evidence in support of all of these considerations. But the history of the formulation of the regulation revealed by correspondence and the records of the state police made while the state police authorities were attempting to spell out a regulation indicate that safety factors were not considered by the officers who prepared the regulation. Discipline and public acceptance of the state police were the main considerations.

3. Inspector Bardossi's memo contained the following rationale:

The Division is semimilitary in organization and a neat well-groomed appearance is fundamental to inspiring public confidence. In this respect our need to inspire a sense of pride and self-discipline in our members closely parallels those of the military.

The establishment of clear-cut guidelines serves two important functions:

   a. Provides a criteria against which the individual member can measure his appearance.

   b. Enables supervisory personnel to regulate and control the personal appearance of subordinates.

The establishment of clear-cut guidelines serves two important functions:

a. Provides a criteria against which the individual member can measure his appearance.

b. Enables supervisory personnel to regulate and control the personal appearance of subordinates.

*Id.*

Inspector Bardossi's emphasis was on the image of the state police and discipline rather than safety.

At the meeting of the Executive Committee on December 16, 1971, Chief Inspector Infante was instructed to prepare proposed guidelines to be distributed to troop commanders in the field. Defendant's Ex. 7. Thereafter, a letter was sent to William A. Thompson, President of the New York State PBA (then certified bargaining agent of New York State Police members below rank of Lieutenant), along with the proposed set of guidelines. Defendant's Ex. 9.[4] Mr. Thompson responded by a letter to defendant dated May 18, 1972, in which he stated that the PBA Executive Board substantially concurred with the regulations but disagreed with the sideburn provisions. Defendant's Ex. 10.[5] The Executive Board rejected the change proposed by Mr. Thompson. Defendant's Exs. 11 and 12. By memorandum of May 26, 1972, defendants promulgated the proposed guidelines as Section 4.18 of Part III of the New York State Police Manual. Defendant's Ex. 14.[6]

Plaintiff, Donald Romano, a member of the New York state police for twelve years, has black hair and sideburns and has not altered his appearance for some time. His sideburns are even with the lower lobe of his ear; his mustache is approximately a sixteenth to an eighth of an inch below his upper lip, and the back of his hair is slightly over his collar, straight and neat. Tr. at 177.[7] The defendant called Chief Inspector Daniel Dakin and counsel Richard Bolton as witnesses in support of the reasonableness of Section 4.18. Inspector Dakin referred to several safety reasons in explaining why the section was necessary. He testified that the wearing of long hair, facial hair and sideburns will interfere with an effective seal necessary for the proper wearing of a gas mask. Tr. at 18, 27. He said that "[t]he critical point is the fact that it fits snugly to prevent the substance from being inhaled." Tr. at 27. In his opinion, long hair could be used as an effective weapon by an assailant, Tr. at 27, 30, and, by falling into a policeman's eyes, long hair could obscure his sight while he was trying to use firearms. Tr. at 30. A review of all of the testimony, however, and the circumstances surrounding the adoption of Section 4.18 leads one to the conclusion that little weight should be accorded to the testimony regarding safety considerations. Before adopting the regulation, the Executive Committee evidently did not consider any of these factors. Furthermore, the testimony about gas masks indicates that neither mustaches nor hair length interfere with the gas mask seal and that there is only a possibility that sideburns could interfere with the seal, and there is no proof that the sideburn length specified in Section

---

4. These proposed guidelines sent to Mr. Thompson ultimately were promulgated as Section 4.18 of Part III of the New York State Police Manual.

5. It is felt that [the sideburn length regulation] could be worded to read, "to the lower part of the exterior ear with a straight cut. There are to be no tapering of the end, or is the sideburn permitted to grow bushy."
Defendant's Ex. 10.

6. In his memorandum to all members. Superintendent Kirwan introduced the regulations:
The longer hair styles, mustaches and beards are today being worn by many in the business world. However, the Division of State Police is basically a semi-military organization and must adhere to a more conservative uniformity in grooming in order to present a more acceptable appearance to the public. A well-groomed appearance is fundamental to inspiring public confidence. To more clearly define the acceptable limitations on personal appearance, a new section is being added to the Instructions in the Manual.
Defendant's Ex. 14.

7. All transcript references are to testimony taken before Judge Curtin, May 29, 1974.

4.18 bears a reasonable relationship to having a good gas mask seal.[8]

To justify Section 4.18 on the possibility that a struggling opponent may use a state policeman's long hair in hand-to-hand combat is not reasonable. This factor was not considered by the Executive Committee in their deliberations. Since the key to this danger is the amount of hair available to grip, the fact that the section does not regulate length of hair on top of the head undercuts this justification. Furthermore, it would seem that hair worn at collar length could be grasped almost as easily as hair worn a little bit longer. If the state police truly considered this a safety factor, the regulation would require hair to be worn much shorter than collar length.[9]

As to the third safety factor, that hair might fall into a state policeman's eyes and interfere with the sighting of his gun, testimony on this point was highly speculative. It was not considered during formative stages and there are other simpler ways to handle this problem. This reason will not suffice to make legitimate Section 4.18.

Chief Dakin and counsel Bolton also explained the need for obtaining public cooperation with the state police, and discipline. Chief Dakin explained that a neat personal appearance of New York policemen, particularly in rural areas, is absolutely necessary in police work.[10]

No testimony explained precisely how Section 4.18 accomplishes the end of discipline. However, in defendant's Exhibit 6, the "semi-military" nature of the state police was referred to.[11] "Discipline although essential to an effective police force as it is to the military is *clearly of a different type.*" Dwen v. Barry, *supra,* 483 F.2d at 1129 (emphasis added). "[I]t has been suggested that the military model of organization and discipline must not be followed too closely as a policeman unlike a soldier frequently acts individually on his own initiative and not subject to the immediate supervision of his superiors." *Id.*

Finally, there is no evidence that Section 4.18 encourages public cooperation via its *specific* guidelines. The more general regulation, Section 8.5, refers to a neat, clean and businesslike appearance. Also, the argument that, because state police activities are largely concentrated in rural areas, personal appearance of state policemen should be strictly defined was contradicted by the testimony of a trooper recently assigned to a rural area.

An analysis of the testimony and the documentary evidence discloses that the true motivation for the promulgation of Section 4.18 was a desire for uniformity of appearance.[12] "Uniformity for uniformity's sake does not establish a public need." Dwen v. Barry, No. 71 C 1020 (E.D.N.Y. May 30, 1974) at 5. Since we find no other legitimate state interests reasonably advanced by the regulation, Section 4.18 cannot withstand the present constitutional attack.

Judgment is granted in favor of the plaintiff and against the defendant declaring Section 4.18 of Part III of the New York State Police Manual unconstitutional, void and of no effect, and permanently enjoining the defendant from enforcing Section 4.18.

So ordered.

8. Indeed, the "American National Standard Practices for Respiratory Protection" suggests that *any* sideburns may prevent an effective gas mask seal. *See* Defendant's Ex. 3.

9. It is apparent that little reliance was placed upon this factor to those who prepared the regulation for they did not discuss it. Furthermore, an assailant could grasp the length of hair permitted by the regulation. If this was a serious factor, the regulation would only permit very short haircuts.

10. However, State Policeman James Kleinsmith, who has recently served in rural areas, testified that the style in which he wears his hair and mustache, similar to that of Trooper Romano's, has, in his opinion, "more or less helped me rather than hindered me in my personal dealings with the public." Tr. at 193.

11. *See* n. 2, *supra.* The same memo emphasizes that the draft of Section 4.18 and its subsections are essentially Army regulations. Defendant's Ex. 6.

12. *See* n. 2 & 5, *supra.*