James RILEY and Loretta Riley, on behalf of themselves and John M. Riley, their minor child; et al., Plaintiffs,

v.

Gordon M. AMBACH, as Commissioner of Education of the State of New York; et al., Defendants.

No. 79 C 2783.

United States District Court, E. D. New York.

July 1, 1980.

Richard C. Cahn, Susan O'Grady, Huntington, N. Y., and Muldon & Horgan, New Rochelle, N. Y. by Edward D. Loughman, Jr., New Rochelle, N. Y., for plaintiffs.

Atty. Gen. Robert Abrams by Judith Gordon, Marion Buchbinder, Asst. Attys. Gen., New York City, for defendants State of New York and Gordon M. Ambach.

Campanella, Zolotorofe & Guercio by Maureen P. Badillo, Gregory J. Guercio, Plainview, N. Y., for defendant Plainview-Old Bethpage Central School District.

Winick, Ginsberg, Erlich, Reich & Hoffman by Lawrence W. Reich, Garden City, N. Y., for defendant Rockville Centre Union Free School District.

Robert W. Tasker, Greenport, N. Y., for defendant Greenport Union Free School District.

Ingerman, Smith, Greenberg & Gross by John Gross, Northport, N. Y., for defendant Half Hollow Central School District No. 5.

Louis N. Orfan, West Hempten, N. Y., for defendant Locust Valley Central School District.

Toaz, Buck, Myers, Brower & Bernst by Louis C. Bernst, Huntington, N. Y., for defendant Elwood Union Free School District.

Richard F. Lark, Cutchogue, N. Y., for defendant Mattituck-Cutchogue School District.

Francis Yakaboski, Riverhead, N. Y., for defendant Southold Union Free School District.

Lipp & Rubin by David S. J. Rubin, Babylon, N. Y., for defendant Levittown Union Free School District.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

This action, brought by eighteen handicapped children and their parents on behalf of themselves and a class of persons similarly situated, seeks to enjoin the enforcement of certain regulations and policies of New York's Commissioner of Education with respect to the education of learning disabled children. The defendants initially named in this action were Gordon M. Ambach, Commissioner of Education of the State of New York; the State of New York; and nine school districts located within the Eastern District of New York. Stipulations of discontinuance have been filed with respect to all the named school districts. On October 29, 1979, plaintiffs applied for preliminary injunctive relief, and the Court scheduled an evidentiary hearing. At the close of the hearing, on January 31, 1980, the parties agreed that the hearing be deemed a trial on the merits with respect to the claims addressed during the hearing. In addition, the parties stipulated that affidavits previously submitted could be considered by this Court as evidence taken at the hearing. Accordingly, the hearing has been treated as having been consolidated with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2) on three of the claims stated in the complaint.[1]

Plaintiffs challenge the following actions of defendant Ambach: (1) his promulgation of a regulation requiring that a learning disabled child "exhibit a discrepancy of 50% or more between expected achievement based on . . . intellectual ability and actual achievement" in order to qualify as a handicapped child within the meaning of the applicable federal and state statutes relating to the education of such children, 8 NYCRR 200.1(d)(4); (2) his removal of all residential schools treating learning disabled children from a list of schools approved by the Commissioner of Education for the treatment of handicapped children, thereby allegedly eliminating such schools as options for the placement of learning disabled children pursuant to applicable federal and state statutes; and (3) his issuance of an advisory memorandum stating that any school district serving learning disabled children in excess of 2% of the total population of school children would be subjected to an annual site visit, thereby allegedly inhibiting the local school districts from classifying children as learning disabled.

Plaintiffs base their challenge to the actions of defendant Ambach primarily on federal statutory and constitutional grounds. The statutes allegedly violated are the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. and 794, and the Education of All Handicapped Children Act of 1975, 20 U.S.C. § 1401 et seq. Plaintiffs also assert, pursuant to 42 U.S.C. § 1983, that defendants have violated their 14th amendment rights to due process and equal protection. In addition, plaintiffs claim that the actions of defendant Ambach violate sections 4402 and 4403 of the Education Law of New York. As a result of this Court's disposition of this case on federal

---

1. The two remaining claims involving state funding of learning disabled children and the certification of special education teachers in New York remain to be tried.

statutory grounds, it need not, with one exception,[2] reach the constitutional issues raised by plaintiffs. *See, e. g., Davis v. Southeastern Community College,* 574 F.2d 1158, 1163 (4th Cir. 1978), *reversed and remanded on other grounds,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979); *Halderman v. Pennhurst State School,* 612 F.2d 84, 94 (3d Cir. 1979); *Gurmankin v. Costanzo,* 556 F.2d 184, 186 (3d Cir. 1977). Nor indeed have plaintiffs briefed and argued the constitutional issues, preferring to rely on their statutory claims. The Court also need not and does not decide the pendent state claims alleging violations of the Education Law of New York, sections 4401 *et seq.*

Before discussing plaintiffs' statutory claims, it will be useful to survey briefly the legislative history of federal assistance for handicapped children. The federal government first directed its attention to the needs of handicapped individuals in the 1970's. The primary legislative manifestations of this concern were section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, which prohibited discrimination against the handicapped in programs receiving federal financial assistance, and the Education for All Handicapped Children Act of 1975 ("EHA"), 20 U.S.C. § 1401 *et seq.,* which established an elaborate federal-state program to secure a "free appropriate public education" for all handicapped children and expanded federal funding of state educational efforts for this purpose. Of special relevance to this case is the fact that EHA amended the definition of handicapped children to include children with specific learning disabilities as one of eleven categories of disabilities covered by the Act. 20 U.S.C. § 1401(15). The statute defines "children with specific learning disabilities" as follows:

"The term 'children with specific learning disabilities' means those children who have a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may mani-

fest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such disorders include such conditions as perceptual handicaps, brain injury, minimal brain dysfunction, dyslexia and developmental aphasia. Such term does not include children who have learning problems which are primarily the result of visual, hearing, or motor handicaps, of mental retardation, of emotional disturbance, or of environmental, cultural or economic disadvantage."

20 U.S.C. § 1401(15). In connection with the passage of this legislation, the Senate Labor and Public Welfare Committee stated that "children with specific learning disabilities, who by reason of their disabilities require special education and related services, should be insured a right to education and . . . parents of such children have a right to expect that individually designed instruction to meet their children's specific needs is available." S.Rep.No.94–168, 94 Cong. 1st Sess. (June 2, 1975) at 10, U.S.Code Cong. & Admin.News 1975, pp. 1425, 1430.

A state may elect to participate in the federal grant-in-aid program established by EHA by meeting the eligibility requirements set forth in 20 U.S.C. § 1412, including a demonstration that it has put into effect "a policy that assures all handicapped children the right to a free appropriate public education." 20 U.S.C. § 1412(1). As a further prerequisite for the receipt of federal funds, the state must submit a detailed state plan which meets the requirements of the federal statute. 20 U.S.C. § 1413.

The New York State program, delineated in New York Education Law sections 4401 *et seq.,* is largely implemented by the local educational agencies or school districts. A district which applies for funding to the State Department of Education must provide assurances that it will expend its monies in conformity with federal and state requirements, including the proper identifi-

---

**2.** An exception is the site inspection issue decided adversely to plaintiffs on constitutional and federal statutory grounds and not alleged to violate any state law. See p. 1247, *infra.*

cation, location and evaluation of handicapped children, 20 U.S.C. § 1414(a)(1)(A), and the preparation of an individual education program ("IEP") for each child found to be handicapped. 20 U.S.C. § 1412(4). *See* New York Education Law 4402. In New York, a child is classified and his IEP is developed by the Committee of the Handicapped ("COH") of the local school district. New York Education Law 4402.1(b)(1)–(3).

An additional federal requirement imposed on participating states is the availability of procedures whereby the evaluation and placement of the child may be challenged and reviewed. 20 U.S.C. § 1415. The procedures in New York include the right to appeal the decision of the COH to an impartial hearing officer; if the hearing officer affirms the recommendation of the COH, the aggrieved party may take a further appeal to the Commissioner of Education. New York Education Law 4404.1–2. Under federal law, a party may challenge the Commissioner's decision in state or federal court. 20 U.S.C. § 1415(e)(2).

In terms of the education of the handicapped, the regulatory programs established pursuant to the EHA and the Rehabilitation Act are the same. The salient features of EHA are echoed in regulations promulgated by HEW under section 504 of the Rehabilitation Act, 29 U.S.C. § 794. 45 CFR 84.33 *et seq. See, e. g., Boxall v. Sequoia,* 464 F.Supp. 1104, 1108 (N.D.Cal. 1979); *Lora v. Bd. of Education of City of New York,* 456 F.Supp. 1211, 1228 (E.D.N.Y.1978), *aff'd in part, vacated and remanded in part on other grounds,* 2 Cir., 248 F.2d 623 (1980).[3] Thus, the statutes and regulations promulgated thereunder will be treated together for purposes of this opinion.

Two significant features of the federal regulatory scheme should be noted. First, there is a clear preference for "mainstream-

ing," or educating handicapped children with non-handicapped children wherever possible. 20 U.S.C. § 1412(5)(B), 45 CFR 121a.550, 45 CFR 84.34(a). A school district must make available to handicapped children a continuum of alternative placements—including regular classes, special classes, private schools, home instruction, and instruction in hospitals and institutions—and the child must be placed in the "least restrictive environment" responsive to the child's individual needs. 45 CFR 121a.551; *Stuart v. Nappi,* 443 F.Supp. 1235, 1242 (D.Conn.1978). Second, an educational program must meet the individual educational needs of each handicapped child. *See, e. g.,* 20 U.S.C. § 1401(16), 45 CFR 121a.14, 121a.552, 45 CFR 84.33(b). The regulations specifically define an "appropriate" education as the provision of "regular or special education and related aids and services that are designed to meet individual educational needs of handicapped persons as adequately as the needs of non-handicapped persons are met." 45 CFR 84.-33(b)(1)(i). This emphasis on individualized treatment is also reflected in the federal requirement that an individual educational program, or IEP, be developed for each handicapped child. 20 U.S.C. §§ 1401(19), 1412(4).

What follows sets forth the specific statutory violations alleged by plaintiffs. One alleged violation concerns the initial classification of a child as learning disabled, while another involves the appropriate placement of a child already so classified. There is also before the Court a third claim regarding the procedures established by New York to monitor the compliance of the school districts with state and federal law.

## "50% DISCREPANCY" REQUIREMENT

Section 200.1(d)(4) of the Regulations of the New York Commissioner of Education

---

**3.** Both statutes establish the following basic objectives summarized in 45 CFR Pt. 84, App. A at 384 (1977): (1) that handicapped persons, regardless of the nature or severity of their handicap, be provided a free appropriate public education, (2) that handicapped students be educated with non-handicapped students to the maximum extent appropriate to their needs, (3) that educational agencies undertake to identify

and locate all unserved handicapped children, (4) that evaluation procedures be improved in order to avoid the inappropriate education that results from the misclassification of students, and (5) that procedural safeguards be established to enable parents and guardians to influence decisions regarding the evaluation and placement of their children.

requires that a learning disabled child "exhibit a discrepancy of 50% or more between expected achievement based on . . . intellectual ability and actual achievement" in order to qualify as handicapped for purposes of EHA. Plaintiffs maintain that this rule is inconsistent with the federal regulatory requirement that a learning disabled child exhibit a "severe" discrepancy between achievement and intellectual ability. 45 CFR 121a.541.[4] They further contend that the "50% discrepancy" rule violates the federal statutory requirement that all handicapped children be identified, located and evaluated, 20 U.S.C. § 1412(2)(C), since it excludes from identification as handicapped those "severely" learning disabled children who do not meet the 50% cut-off established by defendant Ambach. Finally, they contend that the imposition of a *per se* quantitative rule on the multidisciplinary teams that comprise the local committees on the handicapped undermines their discretion and prevent them from making appropriate individualized judgments as to which learning disabled children are entitled to the protection of the statute.

## ELIMINATION OF RESIDENTIAL PLACEMENTS

The New York Commissioner of Education is required to maintain a list of private residential and day schools specializing in the treatment of handicapping conditions that are approved for public funding. New York Education Law 4407.4. A handicapped child is eligible for placement in a school on the "approved list" at public expense if no appropriate educational program is available either in the school district, in a neighboring district, or through the area BOCES (Board of Cooperative Educational Services) program. New York Education Law sections 4401.2, 4402.2. On July 1, 1979, defendant Ambach removed from the approved list all residential schools serving children with specific learning disabilities.[5] The stated ground for this determination was that a learning disability is a "mild" or "moderate" handicapping condition which does not require residential treatment (Ex. 3, 16; Ex. 2, Grumet Dep. at 81, 105).

Plaintiffs contend that this action violates several provisions of the federal statutes and regulations. According to EHA, 20 U.S.C. § 1413(a)(4)(B)(i):

"[H]andicapped children in private schools and facilities will be provided special education and related services (in conformance with an individualized educational program as required by this subchapter) at no cost to their parents or guardian, if such children are placed in or referred to such schools or facilities by

---

4. The EHA regulation, entitled "Criteria for determining the existence of a specific learning disability," states as follows:

"(a) A team may determine that a child has a specific learning disability if:

"(1) the child does not achieve commensurate with his or her age and ability levels in one or more of the areas listed in paragraph (a)(2) of this section, when provided with learning experiences appropriate for the child's age and ability levels; and

"(2) the team finds that a child has a severe discrepancy between achievement and intellectual ability in one or more of the following areas:

"(i) Oral expression;
"(ii) Listening comprehension;
"(iii) Written expression;
"(iv) Basic reading skill;
"(v) Reading comprehension;
"(vi) Mathematics calculation; or

"(vii) Mathematics reasoning.

"(b) The team may not identify a child as having a specific learning disability if the severe discrepancy between ability and achievement is primarily the result of: (1) A visual, hearing, or motor handicap; (2) Mental retardation; (3) Emotional disturbance; or (4) Environmental, cultural or economic disadvantage." 45 C.F.R. 121a.541.

The New York regulation tracks the federal regulation, but adds a final sentence imposing the 50% discrepancy requirement.

5. The effect of this determination was that all new residential placements of handicapped children after July 1, 1979, were disapproved for public funding. *See Lombardi v. Nyquist,* 63 A.D.2d 1058, 406 N.Y.S.2d 148 (1978) (no right to placement in a school not on the Commissioner's list).

the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all handicapped children within such State . . . ."

In the same vein, the federal regulations state that "if placement in a public or private residential program is necessary to provide special education and related services to a handicapped child, the program, including non-medical care and room and board, must be at no cost to the parents of the child." 45 CFR 121a.302, 45 CFR 84.-33(c)(3). Further, federal regulations require that each public agency insure "that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services;" this continuum must include "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." 45 CFR 121a.551.

Plaintiffs contend that these statutes and regulations explicitly require that residential placement be provided if necessary for a particular child and that defendant Ambach has improperly issued a rule excluding this possibility for learning disabled children. Plaintiffs argue that there are learning disabled children for whom residential placement is necessary and that, in any event, this determination lies within the province of the COH to be based on the individual requirements of the child under consideration for placement.

## SITE VISIT PROVISION

In November 1977, the Commissioner of Education circulated an advisory to all school districts in New York informing them that "where the incidence of children with specific learning disabilities served in the district exceeds 2%, the district will be subject to a site visit annually for review of assignment of children and program review by Department staff." Plaintiffs contend that this policy operates to set a limit of 2% on the number of children a district is willing to classify as learning disabled. Thus, the advisory has a "chilling effect" on the readiness of the school districts to provide all eligible learning disabled children with a "free appropriate public education" as mandated by federal law.

Plaintiffs also contend that the three actions of defendant Ambach referred to above, taken together, indicate that the state regards learning disabilities as a "mild" handicapping condition and has relegated this disability to a low priority, "second-class" status. They argue that this contravenes federal law, which mandates that handicapped children be treated without regard to disability category: "A recipient that operates a public elementary or secondary education program shall provide a free appropriate public education to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 20 U.S.C. § 1412(2)(C), 45 CFR 84.33(a).

Plaintiffs request various forms of relief. Initially, they seek class certification pursuant to Federal Rule of Civil Procedure 23. Second, they seek a declaration from this Court that defendants' actions are violative of federal law. Third, they request the following injunctive relief: that defendant Ambach be directed to restore to the approved list all residential schools on that list prior to July 1, 1979; that he cease enforcement of the 50% rule and the 2% site visit policy; and that he inform the school districts and the families of handicapped children of the decision of this Court. Finally, plaintiffs request tuition reimbursement for all parents who placed their children in residential schools for the current school year.

As will be discussed in detail below, the Court declines to certify this action as a class action, to enjoin enforcement of the site inspection provision, or to award tuition reimbursement to plaintiffs. However, based on the findings of fact and conclusions of law set forth herein, a declaratory judgment and an injunction enjoining the use of the 50% discrepancy rule and restoring residential schools to the approved list will issue.

Before discussing the reasons for the foregoing decision, it is necessary to resolve certain preliminary matters regarding the parties, class certification, jurisdiction, and standing. In this connection, it is appropriate first to describe the situation of each plaintiff as established by the record.

## THE PLAINTIFFS

1. John Riley, age 14, Levittown School District. John was classified as handicapped by the Levittown COH in April 1979. Following another COH meeting on June 12, 1979, the school district recommended that John be placed in the Landmark School, a residential school in Massachusetts formerly on the Commissioner's approved list. Shortly after making this recommendation, the school district was informed by defendant Ambach that Landmark had been removed from the approved list and that John's tuition would not be paid by the State. Therefore, on August 30, the COH recommended placement in the Levittown Memorial Junior High School with special education classes. The parents viewed this placement as unsatisfactory and placed John in Landmark at their own expense for the 1979–80 school year. During the pendency of this action the parents requested a review of John's placement. On January 2, 1980, the COH again recommended local placement with the proviso that, if Landmark were restored to the approved list, it would again recommend Landmark as the most appropriate placement. The Levittown School District has entered into a stipulation with plaintiffs to the effect that should this Court order the restoration of Landmark to the approved list, the COH "will reinstate its original recommendation with respect to John Riley for placement at the said Landmark School."

2. Charles Antonoff, 15, Half Hollow Hills School District. The COH of Half Hollow Hills School District classified Charles as handicapped by reason of specific learning disabilities in July 1978 and recommended a resource room program in the local school district. The parents placed Charles in Landmark for the 1978–79 school year and requested an administrative hearing. In May 1979, the hearing officer decided that Charles was severely learning disabled and, because of procedural violations committed by the school district, approved funding at Landmark for the 1978–79 school year. He also directed the COH to develop an IEP for Charles and to find him a proper placement within the school district for the 1979–80 school year. The COH failed to make a recommendation for the current school year, and the parents re-registered him at Landmark. On September 26, 1979, the parents demanded an administrative hearing with respect to the school district's failure to make a timely placement recommendation for 1979–80. No hearing was held, but the COH recommended a resource room placement in December 1979. In January 1980, the parents pursued an appeal to the Commissioner. Defendant Ambach's decision, dated February 29, 1980, held that the December recommendation of the COH obviated the need for a hearing, and accordingly, the appeal was dismissed.

3. Kenneth Antonoff, 13, Half Hollow Hills School District. In July 1978, the COH refused to classify Kenneth as handicapped. The parents placed him in Landmark in September 1978 and requested a fair hearing. On May 29, 1979, the fair hearing officer determined that Kenneth did not meet the 50% discrepancy requirement and denied funding of Kenneth's expenses at Landmark. The parents appealed to the Commissioner. On October 4, 1979, defendant Ambach determined that Kenneth was handicapped by reason of a specific learning disability and ordered that his tuition costs at Landmark for 1978–79 be publicly reimbursed; he also directed that Kenneth's tuition costs continue to be reimbursed until the COH and the school district implemented an appropriate IEP within the local district. The parents requested a rehearing on that portion of the decision mandating that Kenneth be relocated in the home district in the middle of the school year, but this request was denied on December 12, 1979. In December 1979, the COH

recommended that Kenneth be placed in the local school district with resource room treatment one period daily. The parents have sought an administrative hearing on this recommendation.

4. Lawrence Stein, age 13, Plainview-Old Bethpage School District. In January 1978, the COH concluded that Lawrence was handicapped by reason of specific learning disability and commenced a search for placement in the private sector. Meanwhile, he was placed in regular classes with resource room help from a special education teacher. After a COH meeting on June 21, 1979, the parents were assured that a school search would be carried out during the summer months and that the boy would be appropriately placed. By September, the school district had still not recommended a private placement, and the parents placed the child in Pine Ridge School, a school formerly on defendant Ambach's approved list. On December 7, 1979, the parents requested an administrative hearing.

5. Guy Ward, age 16, Locust Valley School District. Guy has consistently been treated as a handicapped child by the school district and has been publicly funded in residential placements since 1974. Guy was placed by the COH in Landmark beginning in 1978–79 and attends that school at the present time. The parents have been informed that as a result of the Commissioner's actions, Guy will not be able to continue in Landmark at public expense in the coming school year.

6. Keith Griffin, age 17, Rockville Centre School District. In October 1979, the COH classified Keith as a learning disabled child and recommended daily resource room help. The parents have requested an administrative hearing on this placement since they believe residential treatment is appropriate.

7. Christopher Henry, age 14, Elwood Union Free School District. On May 3, 1979, the COH classified Christopher as handicapped and recommended placement in a resource room for three hours daily. Instead, the parents placed him in Landmark for the 1979–80 school year and ap-pealed the COH recommendation. The hearing officer upheld the COH, and on December 20, 1979, defendant Ambach directed the COH and the local school district to develop a more complete analysis of Christopher's learning problems so that his classification could be more clearly defined and an appropriate placement recommended. The Commissioner disallowed public reimbursement of the child's tuition costs at Landmark for the 1979–80 school year because the school is no longer on the approved list.

8. Brian Commins, age 16, Mattituck-Cutchogue School District. Brian was classified as handicapped by another school district in June 1977. In September 1979, he entered his present district and was placed in a BOCES program. The parents are dissatisfied with this placement, since they believe residential placement is appropriate, and they have demanded an administrative hearing.

9. Daniel Commins, age 15, Mattituck-Cutchogue School District. Daniel also entered the school district at the beginning of the current school year and is presently in a regular school room placement. His parents contend he is handicapped and entitled to residential placement.

10. Michael Commins, age 11, Mattituck-Cutchogue School District. Michael was classified as handicapped by a previous COH on September 29, 1977, and is presently in a regular classroom in the school district. His parents contend he should be placed in a residential facility.

11. Straty Eoanidis, age 12, Southold Union Free School District. In April 1979, Straty's condition was reviewed by the COH of the Southold School District. The Committee did not determine that Straty was handicapped, but nonetheless prepared an IEP for him in September 1979. Plaintiffs contend that Straty was denied classification as handicapped because he did not meet the 50% discrepancy standard. The parents were dissatisfied with the in-district recommended placement and placed Straty in a private school, Linden Hill School in Northfield, Mass., for the 1979–80

school year. An administrative hearing request was denied as untimely in November 1979. By decision dated January 31, 1980, the Commissioner directed that the school district afford Straty an administrative hearing regarding the appropriateness of the 1979–80 placement, but did not accede to the parents' request that he overturn the failure of the COH to classify Straty as handicapped.

12. Glen Jacobs, age 9, Southold Union Free School District. The COH declared Glen handicapped on May 11, 1978, and recommended a BOCES placement. His placement was reviewed in May 1979 and September 1979; on both occasions the BOCES recommendation was confirmed. Dissatisfied with the program, the parents placed Glen in the Linden Hill School in September 1979. In October 1979, an impartial hearing officer approved the in-district placement, and this decision was appealed to the Commissioner on December 20, 1979. The Commissioner held that a child with a specific learning disability should be educated within the local school district and that there was no right to tuition reimbursement for children placed in unapproved schools; however, he ordered the COH to make a precise determination of Glen's handicapping condition in order to recommend an appropriate educational placement.

13. James Pirillo, age 12, Greenport Union Free School District. James was classified as learning disabled by the school district on June 7, 1978. The COH recommended residential placement and initiated a school search. While the search was proceeding, defendant Ambach eliminated residential schools from the approved list. The parents enrolled James in the Greenwood School, Putney, Vermont, a school which has never appeared on the Commissioner's approved list.

14. Peter Pirillo, age 9, Greenport Union Free School District. Peter currently attends public school. In November 1979, the parents requested testing and a COH evaluation.

15. Peter Romeo, age 14, Mattituck-Cutchogue School District. On May 16, 1977, the COH classified Peter as learning disabled. The Committee recommended placement in the Linden Hill School, but approval was denied by the State Department of Education. His mother placed him in Linden Hill in 1977–78 and in the Greenwood School, Putney, Vermont, in 1978–79. The COH reviewed Peter's placement in December 1978 and recommended placement in the local high school with individual instruction; however, the parents kept him at Greenwood School. On November 9, 1979, the school district denied Peter an impartial hearing on the in-district placement because the request for the hearing was untimely. The parents petitioned defendant Ambach for review of the denial of a hearing. In a decision dated January 21, 1980, the Commissioner dismissed the appeal as untimely, but directed the school district to re-evaluate the child and to recommend an appropriate placement for the current school year.

16. Steven Romeo, age 19, Mattituck-Cutchogue School District. The COH classified Steven as handicapped on September 22, 1976, and recommended placement in a residential facility if BOCES lacked an appropriate program. Steven attended an out-of-district, unapproved school at his parents' expense in 1976–77 and 1977–78 and thereafter entered BOCES I. On December 17, 1979, the parents requested a fair hearing regarding his placement.

17. George Pav, age 11, Northport-East Northport School District. In September 1979, the parents requested a COH evaluation of George. According to plaintiffs, the COH concluded that it could not classify George as handicapped because he did not meet the 50% discrepancy requirement. George is, however, undergoing further testing.

18. Gerard Martone, age 12, Middle County Central School District. In the summer of 1979, the school district temporarily classified Gerard as handicapped and placed him in a resource room. At a COH meeting held on January 17, 1980, the Com-

mittee expressed doubts about its ability to continue Gerard in the program because his tests suggested that he did not meet the 50% requirement. The determination of his classification was adjourned to January 31, 1980, pending further testing.

Thus, fifteen of the plaintiffs have been classified as handicapped (including one conditionally classified as handicapped); one was not so classified, but received an IEP, and two are in the process of being evaluated. Two children are attending Landmark School with the Commissioner's approval for the current school year only, having been placed there prior to the Commissioner's decision on July 1 to remove residential schools from the approved list. Eight were placed in private schools by their parents at the parents' expense, and eight are in in-district placements.

## CLASS CERTIFICATION

Plaintiffs have applied for class certification on behalf of a class composed of all school children in the State of New York having specific learning disabilities within the meaning of 20 U.S.C. § 1401(1) and (15) who are entitled to a free appropriate public education and who require special education and related services. Plaintiffs seek to maintain this action as a Federal Rule 23(b)(2) class action. Defendants oppose class certification on the ground that the named plaintiffs are not personally aggrieved by the challenged practices and because the typicality and commonality requirements of Federal Rule 23(a)(1) are not satisfied.

6. Plaintiffs have also suggested that class certification is necessary to avoid mooting the claims of the class—for example, if all named plaintiffs are eventually deemed to meet the 50% requirement. See Sosna v. Iowa, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); Frost v. Weinberger, 515 F.2d 57, 62–63 (2d Cir. 1975). However, since a determination that a particular plaintiff has, in one year, met the 50% requirement will not, in this Court's view, moot his concern with the application of the requirement to him in the future, class action certification on this ground alone does not appear appropriate.

For reasons discussed below in connection with standing, the Court concludes that plaintiffs have suffered the requisite injury to entitle them to bring this suit either on their own behalf or on behalf of the class, and the Court also concludes that the commonality, numerosity and typicality requirements of Rule 23(a)(1) are met. However, the Court agrees with defendants that class certification is unnecessary where only injunctive and declaratory relief may be awarded as the Court concludes to be the case here (see p. 1248 infra),[6] and the relief granted will automatically inure to the benefit of all members of the proposed class.[7] See, e. g., Galvan v. Levine, 490 F.2d 1255 (2d Cir. 1973), cert. denied, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974).

## SUBJECT MATTER JURISDICTION

Plaintiffs allege jurisdiction under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701 et seq. & 794; EHA, 20 U.S.C. §§ 1401 et seq. & 1415; and the Civil Rights Act of 1871, 42 U.S.C. § 1983, 28 U.S.C. § 1343(3). A number of different issues require discussion under the general rubric of subject matter jurisdiction.

### A. Private Right of Action

There is no longer any doubt that an implied right of action exists under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. As Judge Mishler stated for this Court in Whitaker v. Bd. of Higher Education of City of New York, 461 F.Supp. 99, 107 (E.D.N.Y.1978):

"Since Lloyd [v. Regional Trans. Auth., 548 F.2d 1277 (7th Cir. 1977], every circuit

7. The Court rejects plaintiffs' assumption that class-wide relief is required because the state has not conceded that the judgment will bind it with respect to all claimants. The Court assumes that defendant Ambach will continue in accordance with the requirements of federal law to treat all handicapped children within the state in a uniform manner and will not apply invalid regulations to learning disabled children other than plaintiffs. Thus, the injunction will automatically afford relief to all members of the proposed class.

court which has considered the question, including our own, has sustained the existence of a private cause of action under section 504. *See Davis v. Southeastern Community College*, 574 F.2d 1158 (4th Cir. 1978); *Leary v. Crapsey*, 566 F.2d 863 (2d Cir. 1977); *United Handicapped Federation v. Andre*, 558 F.2d 413 (8th Cir. 1977); *Kampmeier v. Nyquist*, 553 F.2d 296 (2d Cir. 1977)."

The EHA contains an express cause of action in 20 U.S.C. § 1415(e)2: "Any party aggrieved by the findings and decision made [by the state education agency] . . shall have the right to bring a civil action with respect to the complaint presented . . . . in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy." The jurisdictional grant is contained in 20 U.S.C. § 1415(e)4: "The district courts of the United States shall have jurisdiction of actions brought under this subsection without regard to the amount in controversy." The function of 42 U.S.C. § 1983 is to create a private cause of action for constitutional violations, *see Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 617, 99 S.Ct. 1905, 1915, 60 L.Ed.2d 508 (1979), and jurisdiction over such claims is predicated on 28 U.S.C. § 1343(3).

### B. *Exhaustion of Remedies*

Nonetheless, the state contends that jurisdiction does not exist over the present action either under the Rehabilitation Act, EHA, or section 1983 because the statutory conditions precedent have not been satisfied. According to defendants, before this Court may exercise jurisdiction, plaintiffs must exhaust the administrative remedies provided in EHA. That statute states that a parent aggrieved by the decision of a state educational agency with respect to the identification, evaluation and educational placement of the child, or the provision to that child of a free appropriate public education, may bring a civil action in federal court. 20 U.S.C. § 1415(e)2. In New York, the "state educational agency" is the Commissioner of Education, and the impartial review by the Commissioner follows an impartial hearing by the local educational agency. 20 U.S.C. § 1415(b)2, 45 CFR 121a.506, New York Education Law 4404, 8 NYCRR 200.5. Defendants allege that exhaustion of these administrative review procedures is a necessary precondition for subject matter jurisdiction under EHA and, by extension, also for jurisdiction under the Rehabilitation Act or section 1983.

Many courts have already dealt with the need for exhaustion under the Rehabilitation Act. Despite the substantive similarities between EHA and the Rehabilitation Act, the latter statute provides for entirely different administrative remedies: the filing of a complaint with HEW, followed by an agency investigation, a hearing, and, eventually, the termination of funds to the offending agency. 45 CFR 80.6–80.10 and Pt. 81; 84.61. The courts have divided over the question of whether this procedure must be exhausted in private suits involving that statute.[8] Certain cases in this Circuit have held that termination of federal funds to government agencies is inadequate to vindicate individual rights and that, therefore, exhaustion is not required. In *Whitaker v. Bd. of Higher Education, supra,* Judge Mishler dispensed with the exhaustion requirement on the ground that

---

**8.** Exhaustion was required in *Doe v. New York University*, 442 F.Supp. 522 (S.D.N.Y.1978); *Crawford v. University of North Carolina*, 440 F.Supp. 1047 (M.D.N.C.1977); *NAACP v. Wilmington Medical Center*, 426 F.Supp. 919 (D.Del.1977). It was rejected in *Cruz v. Collazo*, 84 F.R.D. 307 (D.Puerto Rico 1979); *Michigan Paralyzed Veterans of America v. Coleman*, 451 F.Supp. 7 (E.D.Mich.1977); *Patton v. Dumpson*, 498 F.Supp. 933 (S.D.N.Y. January 23, 1980); *Whitaker v. Bd. of Higher Education*, 461 F.Supp. 99 (E.D.N.Y.1978). Courts favoring exhaustion rely heavily on *Lloyd v. Regional Transp. Auth.*, 548 F.2d 1277 (7th Cir. 1977). That case, which first implied a private right of action from the Rehabilitation Act, did not require exhaustion because no regulations under the Act had yet been promulgated. Thereafter, the court said, the cause of action should be limited to post-administrative remedy judicial review, assuming the existence of a "meaningful administrative enforcement mechanism." *Id.* at 1286 n.29.

there was no "effective administrative enforcement mechanism for the imposition of any sanction other than the termination of funds." 461 F.Supp. at 108 n.11. Similarly, Judge Owen noted in *Patton v. Dumpson, supra,* that HEW itself "has been outspoken in its belief that exhaustion of administrative remedies should not be required as a pre-requisite to private litigation" under section 504 of the Rehabilitation Act.

Defendants argue, however, that, even if exhaustion may be excused in suits brought under the Rehabilitation Act because administrative procedures would not afford an adequate remedy, a suit predicated upon *both* statutes requires that plaintiffs have first pursued the "effective" administrative remedies delineated in EHA. This question has received little judicial attention. One court has determined that, where EHA procedures have been exhausted, the exhaustion requirements of the Rehabilitation Act have also been satisfied. *Boxall v. Sequoia Union High School District,* 464 F.Supp. 1104, 1110 (N.D.Cal.1979). This does not, of course, answer the question of whether a suit brought under both the Rehabilitation Act and EHA must exhaust EHA procedures, but defendants forcefully argue that enabling plaintiffs to circumvent EHA remedies by adding a cause of action under the Rehabilitation Act—which would be possible in virtually every case in this area—would render the EHA procedures somewhat meaningless. The state further contends that, where, as here, a statute thoroughly provides for the operation of agency expertise, the prescribed procedures are the exclusive means to judicial relief. *Great American Federal Savings & Loan Assn. v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979); *Transamerica Mortgage Advisors, Inc. v. Lewis,* 441 U.S. 930, 99 S.Ct. 2048, 60 L.Ed.2d 658 (1979); *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976).[9]

■ However, even assuming the general correctness of defendants' view that suits under EHA and related statutes all presuppose compliance with EHA administrative remedies, exhaustion is not required in the circumstances of this case. This conclusion is dictated by traditional principles of administrative law.

■ It is well settled that exhaustion is not required where administrative procedures cannot afford adequate relief or where recourse to those procedures would be a futile exercise. With respect to the adequacy of the remedy, Judge Owen recently stated in a case involving the Rehabilitation Act:

"The dispute over exhaustion reduces to one issue: whether there is a meaningful administrative enforcement mechanism for the vindication of personal rights. . . . It is a well-established principle of administrative law that exhaustion is not required if the only available administrative remedy is plainly inadequate."

*Patton v. Dumpson,* 498 F.Supp. 933 (S.D. N.Y. January 23, 1980). *See Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). Plaintiffs contend that, given the issues presented in this case, the individualized review procedures available under EHA are inadequate to provide them with the necessary relief. Although plaintiffs agree that their challenge to state policies encompasses the current placement of their children, the relief sought is an injunction against enforcement of uniform state practices rather than an order directing specific placement for the children involved. Plaintiffs do not seek by means of this litigation to bring before this Court their individual administrative proceedings, nor do they seek review of administrative determinations in any individual case; rather, they challenge those general policy judgments of defendant Ambach which they allege pre-empt the administrative hearing process and prevent the local com-

---

9. Defendants also apply this analysis to the section 1983 claim, arguing that this cause of action as well requires compliance with EHA's statutory scheme and exhaustion requirements.

*See Harris v. Campbell,* 472 F.Supp. 51, 55 (E.D.Va.1979). However, the Court need not decide this question given the results here reached.

mittees from properly identifying and placing handicapped children.[10]

As plaintiffs point out, no person or body in the hearing process established under EHA is empowered to grant the relief here sought, i. e., to enjoin the Commissioner from pursuing policies of general application or to invalidate his regulations on the ground that they conflict with federal law. Thus, the administrative remedies available in this case do not provide plaintiffs with an adequate forum to secure redress of their grievances. See, e. g., Harris v. Campbell, 472 F.Supp. 51, 54 (E.D.Va.1979); Sherer v. Waier, 457 F.Supp. 1039, 1056 (W.D.Mo. 1977). Moreover, courts have included under the rubric "inadequacy of remedy" the situation in which the federal question is plain and exhaustion is a "long and tedious process causing irreparable harm." Martinez v. Richardson, 472 F.2d 1121, 1125 (10th Cir. 1973). In the present case, the administrative process has already proven long and cumbersome,[11] and irreparable harm will result from further delay in the provision of an appropriate education to these children.

Exhaustion is also not required when it would be a futile gesture. In Loughran v. Flanders, 470 F.Supp. 110, 112 (D.Conn. 1979), the court noted that, although the jurisdictional provisions of EHA required a litigant to first exhaust available state remedies, "it is axiomatic that exhaustion is never required where resort to the state procedure would be futile." See, e. g., Eisen v. Eastman, 421 F.2d 560, 569 (2d Cir. 1969), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970); Howard S. v. Friendswood Independent School District, 454 F.Supp. 634, 638 (S.D.Tex.1978); Percy v. Brennan, 384 F.Supp. 800 (S.D.N.Y.1974). The Supreme Court has determined that futility exists when a "state administrative agency was found to have predetermined the issue before it." Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). See, e. g., Harris v. Campbell, 472 F.Supp. 51 (E.D.Va.1979); Romano v. Kirwan, 391 F.Supp. 643, 644 (W.D.N.Y.1975), vacated and remanded on other grounds, 425 U.S. 929, 96 S.Ct. 1656, 48 L.Ed.2d 170 (1976) (challenge to person who promulgates a regulation is a futile gesture). Defendant Ambach has indisputably predetermined the issues raised in this case. The Commissioner has explicitly stated that the 50% discrepancy test is entirely consistent with the "severe" discrepancy standard of 45 CFR 121a.541 and that residential treatment is never appropriate for learning disabled children.[12]

In a case strongly analogous to the one before this Court, Armstrong v. Kline, 476 F.Supp. 583 (E.D.Pa.1979), plaintiffs challenged Pennsylvania's 180-day limitation on publicly funded education to handicapped children. The court there specifically ex-

10. The state apparently concedes that the procedures in 20 U.S.C. § 1415 are inadequate to challenge broad state policy decisions and are limited to review of specific placement and classification decisions, but infers from this that this Court has no jurisdiction to hear claims challenging defendant Ambach's policies generally; rather, the state claims, review of state policy decisions is left solely to HEW in its review of the state plan. The state relies on The Windward School et al. v. State of New York, Docket No. 78 C 3474 (S.D.N.Y. November 2, 1978, aff'd, 2 Cir., 607 F.2d 1000 (1979), a recent case challenging the removal of a private day school from defendant Ambach's approved list without affording parents and children a due process hearing. Defendants' reliance on Windward is misplaced. First, the court found that plaintiffs were unlikely to prevail on the merits of their claim of entitlement to a hearing; it did not dismiss for lack of

jurisdiction. Second, Judge Sand concluded that, while it was unlikely that plaintiffs would prevail on the merits of their claim that the termination of funding to an individual school in accordance with "approved state policy" required a public hearing, he specifically declared that a hearing would be required "were the State to change the policy or procedure for approval of schools," which is the case here.

11. Of the six plaintiffs who have received decisions from the Commissioner, five have had their cases remanded for further evaluation and placement recommendations.

12. See, e. g., Matter of Board of Education of Newark Central School District, Decision No. 9883 (December 29, 1978) (50% rule); Matter of Application of Handicapped of Handicapped Child, Decision No. 10217 (March 10, 1980) (residential placements).

empted the suit from the exhaustion requirement of section 1415 since resort to state remedies would be futile and since prompt relief was required:

> "If plaintiffs had tried to challenge defendants' 180 day rule through the Commonwealth's due process procedures, their efforts would have been futile because of defendants' instructions to hearing examiners that such a program would not be available and that the hearing examiners were without authority to order it."

*Id.* at 587–88. In *Armstrong*, the court based the lack of an exhaustion requirement on legislative intent as well as on legal precedent. *Id.* at 602. Similarly, in this case prompt relief is required, and it would be pointless to subject plaintiffs to a process culminating in an appeal to the person who has promulgated the regulations and has upheld their validity.[13]

Finally, the Court notes that three of the plaintiffs, Kenneth Antonoff, Christopher Henry and Straty Eoanidis, have appealed to the Commissioner, and none of these children has obtained complete relief. Although Kenneth Antonoff was permitted to remain at Landmark at public expense, the Commissioner made clear that the residential placement for Kenneth was to continue only until the school district placed him in an appropriate local program. Defendant Ambach's decision dated October 4, 1979, contained the proviso, "this does not suggest, however, that the child should remain at the Landmark School for the balance of the school year." In the case of Christopher Henry, defendant Ambach determined that the child required further evaluation by the COH before an appropriate program could be devised, but denied tuition reimbursement for 1979–80 on the ground that residential schools are not approved for initial placements. As for Straty Eoanidis, defendant Ambach refused to accede to the parents' request that he overrule the inaction of the COH in failing to classify Straty as handicapped, and he remanded the case for an administrative hearing. Defendants' claim, that these children and their parents are not "aggrieved" by these decisions and, therefore, do not meet the requirements of 20 U.S.C. § 1415(e)2, must be rejected since Kenneth Antonoff and Christopher Henry have been informed that residential placement will no longer be available to them at public expense, and Straty Eoanidis has not yet obtained a formal classification as handicapped.[14]

## C. *Primary Jurisdiction*

■ Defendants argue that, even if jurisdiction exists and exhaustion is not re-

---

**13.** HEW noted in the *Federal Register* that commenters had requested revisions of the regulations to allow for a direct appeal to the courts without using the administrative procedures if the procedures would be futile, if the timeliness or adequacy of the administrative proceedings were being challenged or if a class action were involved. The commenters cited language in the *Congressional Record* in support of this interpretation. 121 *Cong.Rec.* S20433, daily ed. Nov. 19, 1975. The Office of Education of HEW decided not to issue regulations on this question, leaving the issue of exhaustion of remedies "up to the Courts to resolve." 42 *Fed.Reg.* 42512 (December 29, 1977).

**14.** Since the conclusion of the trial, defendants have submitted for the Court's consideration, without objection from plaintiffs, decisions by defendant Ambach with respect to three other plaintiffs, none of whose claims has been mooted. Peter Romeo's appeal was dismissed as untimely, but the school district was ordered to evaluate the child and recommend an appropriate placement for the current school year. De-

cision No. 10168 (January 21, 1980). The Commissioner dismissed the appeal of Charles Antonoff on the ground that the COH's belated recommendation of a placement in December 1979 obviated the need for a hearing based on the school district's failure to act. The Commissioner did not rule on the appropriateness of the placement. Decision No. 10201 (February 29, 1980). In the case of Glen Jacobs, defendant Ambach concluded that the COH had not precisely determined his handicapping condition and therefore ordered the Committee to evaluate him and to recommend an appropriate educational placement. However, the Commissioner denied tuition reimbursement for the Linden Hill School, where the parents had placed Glen in September 1979. The Commissioner noted that, although reimbursement is allowed where the school district has failed to provide a timely appropriate placement, it would not be available in this case because residential schools are no longer on the approved list. Decision No. 10217 (March 10, 1980).

quired, this case should be remanded either to the local school districts or to HEW under the doctrine of primary jurisdiction. That doctrine has been described by the Supreme Court as follows:

> "'Primary jurisdiction' . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views."

*United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

 It is inappropriate to remand this case to the local school districts for the same reason that exhaustion is not required: the relief sought by plaintiffs is not available from the local committees on the handicapped, which are bound by the official policies of the Commissioner. The inadequacy of pursuing administrative remedies in these circumstances has already been referred to, and as Judge Mishler indicated in *Whitaker v. Bd. of Education, supra*, where there is no effective administrative remedy, neither exhaustion nor the primary jurisdiction doctrine applies. 461 F.Supp. at 109. *See Cruz v. Collazo*, 84 F.R.D. 307, 313 (D.Puerto Rico 1979). In fact, plaintiffs do seek a "remand" of the cases to the local districts, but on condition that the districts are able to classify and place the children free of defendant Ambach's restrictions. Thus, plaintiffs argue, the relief granted by this Court will ensure the integrity of the local administrative processes created by Congress and the New York legislature.

As for a remand to HEW, the decision of this Court does not involve matters solely within the expertise of that administrative agency. This Court need not determine what placements are appropriate for the plaintiffs or whether these children in fact exhibit a "severe" discrepancy; it need only decide whether the statute permits the

state to impose rules of the type challenged here—a course followed by numerous courts before. *See, e. g., Lloyd v. Regional Trans. Auth.*, 548 F.2d 1277 (7th Cir. 1977); *Armstrong v. Kline*, 476 F.Supp. 583 (E.D.Pa. 1979); *Boxall v. Sequoia*, 464 F.Supp. 1104 (D.C.Cal.1979); *Howard S. v. Friendswood Indep. Schl. Dist.*, 454 F.Supp. 634 (S.D.Tex. 1978).

Moreover, the injunctive relief requested here cannot be granted by HEW any more than it can be awarded by the local educational agencies. Indeed, the only sanction available to HEW—excluding the state from participation in the federal program and terminating federal funds to the offending state agency—arguably operates to the detriment rather than the benefit of the plaintiffs in this action. Even if HEW were capable of providing an appropriate remedy, it would be inordinately time consuming to submit the matter to it for consideration. As Judge Bartels stated in *New York State Association for Retarded Children v. Carey*, 466 F.Supp. 479 (E.D.N.Y. 1978), a case involving the Rehabilitation Act and EHA: "Under the circumstances of this case, where time is of the essence in insuring that these mentally retarded children are provided adequate programs, we believe it unwarranted to defer to administrative enforcement of the statute. . ." *Id.* at 486.

Accordingly, the Court denies defendants' request that this case be remanded to the local school districts or to HEW under the doctrine of primary jurisdiction.

### D. *Standing*

 Defendants contend that plaintiffs lack standing to bring this action because they have not suffered cognizable harm. First, defendants insist that no plaintiff has been excluded from classification as handicapped by virtue of having less than a 50% discrepancy. Second, defendants claim that no plaintiff has made a colorable showing that he is being harmed by the denial of a residential placement. This Court finds, however, that plaintiffs have sufficient injury to meet the "case or controversy" requirement of Article III.

With respect to the 50% standard, it appears from the credible evidence, including the testimony of his mother, that the reason that Straty Eoanidis was not classified as handicapped was because of the application of the 50% rule by the local COH. In reaching this conclusion the Court assumes that this rule, which defendants admit is legally binding on the school district, is routinely implemented as a means of determining whether a particular applicant is handicapped. The state's only other explanation for Straty's non-classification is that Mrs. Eoanidis did not wish him so classified, but this proposition was vigorously contested by Mrs. Eoanidis in the course of her testimony which the Court accepts as credible. Moreover, the test results show that Straty was not, in fact, qualified under the 50% rule as implemented by the defendants (Exs. 9, D).

Regarding Gerard Martone and George Pav, defendants allege that plaintiffs are merely speculating that the 50% standard might be applied to these children at some future time; however, this Court is convinced from the testimony and the exhibits that the threat of the application of the 50% rule is sufficiently concrete to stimulate these plaintiffs to litigate this claim vigorously. As the Supreme Court stated in *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), the critical question is whether plaintiff has alleged " 'such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction and to justify the exercise of the court's remedial powers on his behalf." Indeed, the Court concludes that all plaintiffs have standing to raise this claim since they all confront the application of the 50% rule in their annual evaluations. Under federal and state law, the state must provide an annual evaluation of individual educational programs. 20 U.S.C. §§ 1413(a)(11), 1414(a)(5); 20 CFR 121a.146, 121a.343(d); New York Education Law 4402.1(b)(2); 8 NYCRR 200.4(a)(5). According to guidelines issued by the state, the COH must annually review the status of the child utilizing IEP reports and other suitable information "to make recommendations as to modification, change or continuation of classification and/or special education program services." *The IEP: A Guide for Development* (September 1979); *see* 8 NYCRR 200.5(b). Moreover, the state must provide a clinical re-evaluation of every child in a special education program at least once every three years. 20 CFR 121.534(b); New York Education Law 4402.1(b)(3)(d). There is no suggestion, nor would it be reasonable to assume, that a child will retain his status as handicapped if the review process indicates that the child no longer satisfies the 50% criterion. It would surely be a waste of state resources to continue to provide special education and related services to a child whose handicap, as defined by the state, has been remediated. Although defendants claim that children will not be declassified if their discrepancy falls below 50%, they provided no evidence to support this proposition. Indeed, the Commissioner's own Advisory Panel recommended that the 50% rule be deleted from the regulations because it was instrumental not only in the denial of special education to qualified children, but also "in the *removal* of children from special education who *may continue to need* such services." (Ex. # 5, emphasis added.) Hence, the Court concludes that every plaintiff has the requisite standing to challenge the 50% discrepancy rule.

With respect to residential placement, there are numerous plaintiffs whose local COH recommended residential placement, but the recommendation could not be implemented or continued beyond the current school year because of the removal of residential schools from defendant Ambach's approved list. The strongest case is perhaps presented by John Riley. In June 1979, the Levittown Union Free School District COH recommended that John be placed in Landmark School; the district was forced to withdraw this recommendation after the Commissioner removed residential schools from his approved list. However, at a meeting on January 2, 1980, as reflected in a stipulation signed by plaintiffs and the school district, the district

reiterated its willingness to place John in Landmark should the Court restore residential schools to the approved list.

Defendants rely heavily on the argument that the burden of proof is on plaintiffs to prove not only that they were denied residential placement, but that this caused them injury in the sense that a residential setting is required to implement the educational services prescribed by their IEP. They contend that the IEP only states what "special education and related services" must be provided to the child and that plaintiffs must establish that these programs and services cannot be provided in a local placement. This analysis, which unrealistically abstracts the "educational services" from the setting in which they are provided, ignores the fact that the IEP must specify both the type of instruction that is to be provided and the context in which it must be given, especially the extent to which the child can be educated in a regular classroom. As the state's witness, Dr. Flegenheimer, testified, the IEP contains "the setting in which the services are to be provided." [15] (Tr. at 426.) The parents of the infant plaintiffs have submitted affidavits describing from their point of view the necessity of residential schooling for the children, but equally important, the COH's recommended residential placement for certain infant plaintiffs. As previously noted, the issue is not how these children can best be educated, but whether the COH's, which are to make this determination in the first instance, can consider placement in a residential school as an available option. Those plaintiffs who have been in the past or are presently considered by their COH to be most appropriately educated in a residential setting obviously have a significant stake in the outcome of this litigation.

Accordingly, the Court concludes that plaintiffs have the requisite standing to bring this action.

## DISCUSSION OF THE MERITS

### I

### THE 50% DISCREPANCY RULE

Plaintiffs argue that the 50% rule is inconsistent with the federal standard which requires that a child exhibit a "severe" discrepancy between expected and actual achievement. To support their argument that "50%" is a more restrictive criterion than "severe," plaintiffs claim that implementation of the 50% rule caused the number of learning disabled children in New York schools to drop from 28,172 to 12,167 between 1977–78 and 1978–79. They also point to the fact that in 1978, New York classified .67% of the schoolage population as learning disabled; the only areas in the country that served a smaller learning disabled population are said to be Washington, D. C., Mississippi and Puerto Rico (Ex. # 8 at 162). Plaintiffs also suggest that the existence of the rule explains the fact that HEW reported to Congress in 1979 that there were 95,506 potentially unserved learning disabled children in the State of New York (Ex. # 8 at 163). Plaintiffs' expert witnesses, Dr. Richard Masland, Dr. Jeanne McCarthy and Sister Winifred Danwitz, testified to the inappropriateness of utilizing a 50% discrepancy standard to determine whether a child is learning disabled within the terms of the federal statute (Tr. at 56–59, 91–94, 357–59). Moreover, defendant Ambach's Advisory Panel recommended that the rule be abolished because it resulted in the underclassification of learning disabled children (Ex. # 5). Plaintiffs argue generally that the Commissioner intentionally seeks to reduce the number of children classified as learning disabled in New York through such mechanisms as the 50% rule and the site inspection provision.

Defendants, on the other hand, while conceding that the 50% discrepancy rule is "legally binding" on the school districts (Tr. at 550), insist that it merely provides an opera-

---

**15.** The IEP shall include a "statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs." 20 U.S.C. § 1401(19); 45 CFR 121a.346(c); 8 NYCRR 200.4f(1)(iii).

tional definition of the term "severe discrepancy" appearing in the federal regulations. 45 CFR 121a.541(a)2. The objective in promulgating this rule, defendants claim, was not to reduce the number of learning disabled children, but rather to insure that there would be a consistent basis statewide for identifying learning disabled children (Tr. at 430–31). The state argues that HEW does not object to the 50% rule as indicated by its approval of the 1978–79 New York plan and by responses to private inquiries reprinted in the Education of the Handicapped Law Report. In answer to plaintiffs' contention that the 50% rule caused a decline of 11,005 learning disabled children between 1977–78 and 1978–79, defendants explain that the decrease was caused by the fact that in 1977–78, the school districts reported as learning disabled all children whom they were actually serving as learning disabled; but in 1978–79, they reported as learning disabled only those children who had formally been so classified by the COH (Tr. at 572–73). According to the state, the number classified as learning disabled rose in the current school year to 23,000; this figure represents .76% of the state's schoolage population and does not include the large schoolage population residing in New York City (Tr. at 433). Defendants also observe that defendant Ambach ignored the recommendation of his Advisory Panel because the panel did not recommend a substitute provision, and in any event, the resolution never explicitly stated that the 50% standard conflicted with federal regulations (Ex. # 5).

Finally, the state emphasizes, the school districts were officially advised in Information Bulletin No. 3 ("Guidelines for Specific Learning Disabilities," September 1978, Ex. # 6) to include non-quantifiable criteria and non-standardized diagnostic techniques in determining whether a child exhibits a 50% discrepancy. According to defendant Ambach, the 50% rule is a judgmental rather than a rigid quantitative standard; it only requires that the COH, based on all the available information, conclude that a child is failing to measure up to half his potential (Tr. at 416, 421; Ex. # 2, Dep. at 90). The state's expert, Dr. Flegenheimer, testified that not all evaluation techniques need be standardized and that the state permits non-quantitative assessment in areas not amenable to standardized tests. She noted that a battery of tests, including a psychological examination, is given to each child and that his classroom behavior must be observed (Tr. at 543–44; Ex. # 2, Dep. at 90). The state contends that a child need not be evaluated only in terms of grade scores (Tr. at 532–24, 543).

Having considered the evidence at the hearing and the parties' contentions, the Court concludes that the use of the 50% standard interferes with the proper identification of learning disabled children, as required by 20 U.S.C. § 1412(2)(C), since it operates to eliminate consideration of factors and the use of techniques which do not, given the present state of the art, lend themselves to quantification.[16]

16. EHA regulations provide with reference to evaluation procedures generally that no single procedure is to be used as the sole criterion for determining an appropriate educational program and that the evaluation must be made by a multidisciplinary team. Moreover, the child must be assessed "in all areas related to the suspected disability, including, where appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities." 45 CFR 121a.532. The Rehabilitation Act regulations state that in interpreting evaluation data and in making placement decisions, the state "shall draw upon information from a variety of sources, including aptitude and achievement tests, teacher recommenda-

tions, physical condition, social or cultural background, and adaptive behavior;" "adaptive behavior" is defined as the "effectiveness with which the individual meets the standards of personal independence and social responsibility expected of his or her age and cultural group." 45 CFR 84.35(c); Section 84.-33 App. A at 415. Under New York law the COH must review and evaluate all relevant information, including results of physical and psychological examinations and "other suitable evaluations and examinations as necessary to ascertain the physical, mental, emotional and cultural-educational factors which may contribute to the handicapping condition." New York Educational Law 4402.1(b)(3)(a). With regard to the criteria for determining a specific learn-

The Court bases its conclusion on the following considerations. First, no evidence has been presented to support the proposition that the 50% rule is, in fact, interpreted by the local COH's to whom it is addressed and by whom it is applied as being a flexible, judgmental standard. Despite Information Bulletin No. 3 and the expressed intention of the state to include diverse criteria in determining a 50% discrepancy, local COH's have not been informed how unquantifiable factors of conceded importance in diagnosing learning disability are to be translated into a quantitative conclusion. On the contrary, the evidence demonstrates that the school districts reach their decisions primarily, if not exclusively, on the basis of quantitative tests and grade scores which lend themselves to quantification.[17] Second, a standard that is regularly interpreted as relying on standardized tests producing quantitative results is inappropriate given the agreement of the witnesses, those produced by plaintiffs and defendants alike, that current testing procedures are inadequate and inaccurate when relied upon to produce quantitative results, and, hence, their usage will result in an underidentification of learning disabled children.

With regard to the first point, although the state claims that non-quantifiable criteria going beyond standardized tests scores may be taken into account by the local COH, there was no evidence presented that the regulation promulgated by defendant Ambach is so interpreted or that anyone understands that the non-standardized techniques set forth in Information Bulletin No. 3 may be readily used to determine whether the 50% criterion has been met. •Indeed, Information Bulletin No. 3 explicitly states that the evaluation conducted shall, "to the extent possible and appropriate, include the use of individual standardized diagnostic techniques" which are recognized as producing quantitative results (Ex. # 6).[18] In any event, the evidence at trial suggests that any efforts by the state to encourage non-standardized techniques have not and will not be successful because of the absence of any current methodology to translate the results of non-standardized evaluative techniques into results which are meaningful in terms of the 50% discrepancy standard. As a consequence, the COH members have, perhaps understandably, as revealed by the evidence, fallen back on utilizing test scores translated into grade scores as the primary determinants of a discrepancy (Tr. at 57–58, 347; Ex. # 20).

The use of the 50% discrepancy test is especially inappropriate given the conceded imprecision of current testing procedures. As Assistant Commissioner Grumet testified at his deposition, the "testing procedures are very poor." (Ex. # 2, Dep. at 141.) That Congress, in adopting EHA, was disturbed about abuses in the testing and evaluation of children was noted by Judge Weinstein in *Lora v. Bd. of Ed. of City of New York, supra,* 456 F.Supp. at 1228:

"Of further concern to Congress were the inadequate standards and materials used in the process of evaluating students for special education programs:

"'The Committee is alarmed about the abuses which occur in the testing and evaluation of children, and is concerned that expertise in the proper use of testing and evaluation procedures falls far short of the prolific use and development of

---

ing disability, the EHA regulations require that at least one COH member "observe the child's academic performance in the regular classroom setting." 45 CFR 121a.542. The issue posed by this litigation is, in essence, how these many evaluative and diagnostic procedures can be reconciled with a simple 50% discrepancy test. The Court concludes that they cannot and that, if the 50% rule remains in place, it will be at the expense of one or more of these evaluative and diagnostic techniques.

17. *I. e.,* a seventh-grade student is determined to show a 50% discrepancy when his test scores indicate that he is performing at grade level 3.5.

18. Information Bulletin No. 3 adds, however, that "if individual, standardized, diagnostic techniques are not appropriate, nonstandardized evaluation techniques, group evaluation techniques, or other specific techniques, may be utilized," provided the use of these other techniques is justified by the committee in writing. (Ex. # 6).

testing and evaluation tools. The usefulness and mechanistic ease of testing should not become so paramount in the educational process that the negative effects of such testing are overlooked.' "S.Rep.No.94–168, 94 Cong., 1st Sess., at 29; U.S.Code Cong. & Admin.News, p. 1453 (1975)."

Similarly, the federal regulations note that the prescribed evaluation procedures "are aimed primarily at abuses that result from misuse of, or undue or misplaced reliance on, standardized scholastic aptitude tests." 45 CFR 84.33 (App. A at 415).

The Court finds support for its conclusion that the 50% rule is violative of federal law in the fact that defendant Ambach's Advisory Panel for the Education of Children with Handicapping Conditions, a body with considerable expertise, itself recommended that the state rule be deleted. The panel declared that, since the rule was "instrumental in the denial of special education to children otherwise qualified to receive special education," and since "appropriate utilization of local multidisciplinary teams will more effectively identify children with a specific learning disability without a guide of 50% discrepancy, which has become a requirement that effectively denies special education to many children," the rule should "be deleted in its entirety." (Ex. # 5.) [19]

Finally, the Court is persuaded by the fact that in promulgating its regulations under EHA, HEW rejected a 50% rule, along with an accompanying mathematical formula to determine whether a 50% discrepancy exists, because of its lack of success in devising a formula which would successfully translate the results of evaluative techniques into a 50% discrepancy cutoff.[20] The New York rule does not contain the mathematical formula rejected by HEW, but neither does it substitute for that formula any alternative method of arriving at a determination that a numerically defined discrepancy exists. Presumably, the COH is left to bridge the gap, but the Court finds no basis for concluding that the COH members can do what HEW failed to do, namely, develop a quantitative methodology for translating a "severe" discrepancy into a "50%" discrepancy. Despite the theoretical utility of formulating a quantitative definition of "severe," despite the fact that "50%" is not on its face inconsistent with "severe," and despite the fact that in theory there is no conflict between individualized consideration of a child's disability and a quantitative standard, the Court concludes on the basis of the record before it that the COH's cannot translate into the "50% discrepancy" standard the criteria that they are required to consider by the federal definition of children with specific learning disabilities and that, accordingly, enforcement of the rule results in the failure to identify, locate and evaluate children with such disabilities. 20 U.S.C. § 1412(2)(C).

For the foregoing reasons, the Court concludes that the 50% rule must be enjoined.

**19.** It should be noted that, insofar as the 50% rule is intended to secure uniformity in the identification of learning disabled children, the report of the Advisory Panel gives as one reason for the panel's decision that the 50% standard was subject to "various interpretations" and was not uniformly applied (Ex. # 5).

**20.** In November 1976, HEW proposed a complicated mathematical formula along with the 50% discrepancy rule to be used in identifying learning disabled children (Ex. A). Following a review of objections to the formula, HEW rejected the rule and the formula. 42 *Fed.Reg.* 25084, December 29, 1977 (Ex. # 23). Regarding the formula, HEW commented: "Many commenters objected to the formula proposed for establishing a severe discrepancy between ability and achievement. Their concerns fell primarily into four areas: (1) The inappropriateness of attempting to reduce the behavior of children to numbers; (2) The psychometric and statistical inadequacy of the procedure; (3) The fear that use of the formula might easily lend itself to inappropriate use to the detriment of handicapped children; (4) The inappropriateness of using a single formula for children of all ages. . . . The formula has been deleted. Because of the above and other concerns, the Office of Education conducted a study to determine the effectiveness of the formula. While the findings showed that the formula has a certain degree of operational validity, they also identified pronounced technical limitations in its application, including all four concerns listed above." *Id.*

## II

## ELIMINATION OF RESIDENTIAL SCHOOLS

Plaintiffs further argue that under federal law residential placement must be available when necessary to provide a free appropriate public education to a handicapped child. They rely on general regulations provisions requiring that placement decisions be made on an individual basis and that a child be placed in a program designed to meet his or her individual needs. *See, e. g.,* 45 CFR 84.33(a), 45 CFR 121a.552 (Comment). They also point to specific provisions regarding residential schools contained in the statutes and regulations. In this connection, EHA regulations specify in 45 CFR 121a.551:

"(a) Each public agency shall insure that a continuum of alternative placements is available to meet the needs of handicapped children for special education and related services.

"(b) The continuum required under paragraph (a) of this section must:

"(1) Include the alternative placements listed in the definition of special education . . . (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions)."

And *see* 20 U.S.C. § 1413(a)(4)(B)(i). In addition, they note that the regulations state that, if placement in a private residential program "is necessary to provide special education and related services to a handicapped child, the program, including nonmedical care and room and board, must be at no cost to the parents of the child." 45 CFR 121a.302. Plaintiffs argue that defendant Ambach may not promulgate a regulation that prevents the local agency from placing a child in a residential school when it has concluded that such placement is necessary and appropriate in that child's particular case.

Defendants contend, however, that the elimination of residential schools for learning disabled children is consistent with the federal statutes, because EHA expresses an explicit preference for "mainstreaming" and because, given the nature and severity of specific learning disabilities as a handicap, it will never be necessary and appropriate to place a learning disabled child in a residential school.

The mainstreaming concept embraced by EHA is contained in 20 U.S.C. § 1412(5)(B), which requires that each public agency shall assure:

"That, to the maximum extent appropriate, handicapped children . . . are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."

*See* 20 U.S.C. 1414(a)(1)(C)(iv); 45 C.F.R. 84.34(a), 45 C.F.R. 121a.550. Of the continuum of alternative placements mandate by statute—regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions—the "least restrictive environment" must be selected for the child. Defendant Ambach argues that his elimination of residential schools as an alternative for learning disabled children is congruent with the terms of the Act, since it simply eliminates the most restrictive alternative for the least handicapped class of children. Learning disabled children can be served locally in self-contained classrooms, resource rooms or BOCES placements (Tr. at 442, 448, 504). Thus, a specific learning disability is not, according to defendants, the type of severe handicapping condition that requires residential treatment, and the specific schools removed from the list did not provide any programs or services not available locally. Defendants claim that in light of the Act's preference for mainstreaming the removal of schools from the approved list was valid and desirable.

Plaintiffs respond that the decision as to whether residential placement is necessary must be made on an individual basis by the

COH and that they have demonstrated that for some learning disabled children residential schooling is essential to the effective remediation of their handicaps, i. e., that for them, a residential environment *is* the least restrictive alternative. Further, plaintiffs respond that they have shown that there are learning disabled children who potentially could be accommodated locally, but presently are confronted by a lack of appropriate local programs. For these children, residential placement is necessary as an interim measure.

Plaintiffs' expert witnesses testified and the Court finds that a small number of learning disabled children require a residential placement and that specific learning disabilities are not necessarily of such nature or severity that education in regular classes can, without exception, be achieved satisfactorily. Dr. Masland, for example, stated that certain learning disabled children become demoralized and frustrated when educated in contact with ordinary children and are unable to attain the level of concentration necessary to remediate their handicaps, even if special aids and services are supplied in the regular school environment. Dr. Masland further testified and the Court finds that residential treatment is for some children for some period of their education the least restrictive environment (Tr. at 65). Other experts confirmed the need of some learning disabled children for intensive programs in a structured residential environment (Tr. at 62–64, 109–12, 309–10, 315–16; testimony of Dr. Charles Drake at a Fair Hearing held on Dec. 21, 1978, at 255–59).

Of equal importance, however, is the fact that plaintiffs established that some local programs are presently inadequate to serve learning disabled children and that, therefore, a COH is required to have the opportunity to recommend residential placement until an appropriate program, including the development of supplementary aids and services, can be developed by the school district. Plaintiffs point out that according to defendants' own testimony the Commissioner has not been uniformly successful in compelling local districts to provide the required services and often has been unaware of a district's noncompliance (Tr. at 443, 574, 582; Ex. # 2, Dep. at 52, 143; Ex. # 24). Defendants concede that, if a school district fails to offer a timely appropriate program and the parent places the child in a residential school, the parent is not entitled under state law to tuition reimbursement because these schools are no longer on the approved list.

The Court does not here decide whether residential treatment is or is not, in fact, necessary for any individual plaintiff, or whether appropriate services for learning disabled children are or are not available in the local districts in which plaintiffs reside. Decisions such as these are left by statute in the hands of the local committees, which, in accordance with the mainstreaming principle, will recommend a residential placement only if necessary and appropriate for a particular child because of either the nature or severity of that child's disability or the absence of a suitable local program. If a parent disagrees with the recommendation of the COH, he or she can appeal the decision through the usual administrative process. The only issue before this Court is whether residential placement must be available as part of the mandated continuum.

■ The Court concludes that a residential school must be an option available to the local committee on the handicapped. Federal regulations state that the continuum must include instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions. 45 CFR 121a.551(b)(1).[21] As

---

21. Defendants argue that residential schools are not contained in the continuum of 45 CFR 121a.551, which refers to private schools in general and does not specifically refer to residential schools and that, insofar as special schools are part of the mandated continuum, BOCES meets this requirement. But it is clear that residential placement is intended to be encompassed by the term "special school" in light of the fact that the regulations are replete with references to residential placements. *See,* e. g., 45 CFR 84.33(c)(3) quoted in the text *in-*

recently noted in *North v. Dist. of Columbia*, 471 F.Supp. 136, 139 (D.D.C.1979), it is clear that under federal law residential placement must be provided where appropriate. As we have seen, EHA regulations specify that, when residential care is required, it must be at no cost to the parents. 45 CFR 121a.302. Defendants' obligations are also codified in the regulations promulgated under the Rehabilitation Act:

> "If placement in a public or private residential program is necessary to provide a free appropriate public education to a handicapped person because of his or her handicap, the program, including non-medical care and room and board, shall be provided at no cost to the person or his or her parents or guardian."

45 CFR 84.33(c)(3).[22]

Nor was there any evidence offered by the Commissioner at the hearing to support his conclusion that this statutorily recognized handicap is in all cases of such limited severity that education in a mainstream school will always be satisfactory, despite the clear evidence to the contrary offered by plaintiffs. In the absence of any evidence of this sort, such a determination by the Commissioner discriminates against one category of handicapping conditions in contravention of statutes and regulations which prohibit discrimination between different types of handicaps. 20 U.S.C. § 1412(2)(C); 45 CFR 84.33(a). Moreover, the determination violates the "overriding rule" that "placement decisions must be made on an individual basis."[23] It may be that residential placement is rarely the least restrictive environment for a learning disabled child; but this determination must, under the cited statutes and regulations, be made on a case-by-case basis by the multi-

disciplinary teams which comprise the local committees on the handicapped. In granting relief to plaintiffs, the Court is not determining the appropriate placement for any child, but is only remanding these cases to the local COH's so that they may make the appropriate decisions free of the general determination codified in the removal of all residential schools from the Commissioner's approved list.

In all events, the availability of residential treatment is not inconsistent with the meanstreaming principle. The following quotation, taken from HEW's 1979 report to Congress on the implementation of EHA, bears directly on the issues before the Court:

> "What constitutes an appropriate educational placement for an individual handicapped child is of course a matter for local determination. However, the overriding rule is that decisions must be made individually rather than by categorizing the child as belonging to a particular group or carrying a particular label. The principle of least restrictiveness rules out blanket judgments based on general handicapping conditions. The situation is not without its complexities.
>
> Consider, for example, a school district which recently closed its special schools for trainable mentally retarded children, and now serves them in self-contained classes in regular schools. Such a shift appears to be in the spirit of the least restrictiveness principle. However, the children and their parents still are left with only one placement option. There is no guarantee that this option will truly be appropriate for every individual child. Thus, exemplifying the proper spirit may

---

*fra.* In any event, if a residential special school is necessary to provide a free appropriate education for some children, it is necessarily part of the continuum. As the Comment to 45 CFR 121a.552 states, each agency is required "to have various alternative placements available in order to insure that each handicapped child receives an education which is appropriate to his or her individual needs."

**22.** The EHA regulations state that, if a free appropriate public education is provided to a

child and the parents choose nonetheless to place the child in a private school, the public agency need not pay for the child's private education. Disagreements between the parent and the public agency regarding the availability of an appropriate program and the question of financial responsibility are subject to due process procedures. 45 CFR 84.33(c)(4), 45 CFR 121a.403.

**23.** 45 CFR 121a.550(b)(1); 45 CFR 121a.552.

be an entirely different matter than meeting the Act's requirements."

*Progress Toward a Free Appropriate Public Education: A Report to Congress on the Implementation of Public Law 94–142.* Department of Health, Education and Welfare, Office of Education, January 1979 (Ex. # 8 at 40).[24] *See Halderman v. Pennhurst, supra,* 612 F.2d at 114–15.

In this developing area of educational law, courts have frequently focused on the requirement that education programs must meet a handicapped child's unique needs and have accordingly invalidated broad rules imposed by the states. In *Armstrong v. Kline, supra,* 476 F.Supp. 583, the court rejected a 180-day limit on the education available to a handicapped child since some children might require education in excess of 180 days in order to achieve self-sufficiency. Another such rule was struck down in *In Re "A" Family,* 602 P.2d 157 (Mont. 1979), which overturned a state regulation prohibiting a school district from providing psychotherapy to handicapped children. The Montana Supreme Court found that these services must be provided when necessary to a child's education. In the *North* case, as we have seen, the court ruled that, when residential care is necessary, it must be provided at no cost to the parents. *North v. Dist. of Columbia Bd. of Ed., supra,* 471 F.Supp. 136. For reasons similar to those set forth in those cases, the removal of all residential schools by defendant Ambach must be enjoined.

## III

### SITE INSPECTION PROVISION

Plaintiffs contend that an advisory circulated to the school districts in November 1977 entitled "Guidelines for Specific Learning Disabilities" has had a chilling effect upon the willingness of the school districts to classify children as learning disabled. The guideline states:

"Where the incidence of children with specific learning disabilities exceeds 2 percent, the district will be subject to a site visit annually for review of assignment of children and program review by Department staff."

Plaintiffs claim that the threat of a site inspection operates in practice to place a ceiling on the number of children that a district is willing to classify as learning disabled. Plaintiffs' witnesses testified that the site visit provision is generally perceived by educators as a "cap" and is in fact a mechanism utilized by Ambach to reduce the number of learning disabled children served in the state (Tr. at 123, 132, 388–39, Ex. # 7). Plaintiffs also argue that the inspection provision is calculated to render the districts punctilious in their application of the 50% rule and that its use in connection with only one type of handicap is discriminatory.

According to defendants, the intent of the advisory was not to limit the number of children classified as learning disabled, but to assure that handicapped children are properly classified and placed (Tr. at 474, 493). The state's witness, Dr. Flegenheimer, testified that the effect of the advisory would be to "make [the school districts] think about whether they're classifying learning disabled children appropriately and whether they're classifying other children appropriately." (Tr. at 587.) Defendants claim that their benign intent is reflected in the fact that non-obligatory state funds for learning disabled children rose from $6.8 million in 1978–79 to $11.4 million in 1979–80 (Tr. at 470–71). In any event, defendants argue, that challenged provision has never been implemented [25] (Tr. at 473–74, Ex. # 2, Dep. at 116–17).

---

24. Judge Weinstein observed in *Lora v. Bd. of Ed., supra,* 456 F.Supp. at 1267: "Mainstreaming includes a movement away from rigid labelling. . . . Rigid labels are to be replaced by more flexible definitions of exceptional children, definitions designed to emphasize specific learning needs rather than defects. The child is to be placed in the least restrictive environment possible to meet these needs." *Id.* at 1267.

25. Assistant Commissioner Grumet testified at his deposition that the state currently monitors every school district with 400 or more handicapped children and one-third of the other school districts based on more than a 25%

The Court concludes that plaintiffs have not met their burden of establishing the lack of rational relationship between the site visit provision and the legitimate purposes it was designed to serve, namely, insuring against incorrect evaluations and diagnoses in an area where, as plaintiffs elsewhere concede, these are exceedingly difficult to make. They have provided no specific evidence of the in terrorem effect of the guideline, nor have they established that children have been misclassified in order to prevent the state from carrying out this threat. In the opinion of this Court, the purpose of the provision is salutary—to monitor compliance with the statutory program—and no direct injury to plaintiffs has been demonstrated. In light of the paucity of direct evidence on this point and the fact that the provision has never been implemented, the Court finds that plaintiffs have not established their entitlement to injunctive relief either under the federal statutes or under the due process clause of the 14th amendment.

### RELIEF

■ Plaintiffs' request for tuition reimbursements to parents who placed their children in residential schools during the current school year is denied. Any award of damages against the state for tuition reimbursement is barred by the 11th amendment. *Stemple v. Bd. of Education of Prince George's County*, 464 F.Supp. 258, 262 (D.Md.1979). *See Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Stubbs v. Kline*, 463 F.Supp. 110 (W.D.Pa.1978); *Patton v. Dumpson*, 498 F.Supp. 933 (S.D. N.Y. January 3, 1980).[26] To the extent that Commissioner Ambach awards reimbursement when appropriate to parents of handicapped children retroactively to the beginning of the school year, the restoration of the schools to the approved list will entitle each child—if the application is timely and residential placement is found to be appropriate—to reimbursement of the full expenses of the current year's placement. Assistant Commissioner Grumet has confirmed in his deposition that the Commissioner's policy is to award tuition reimbursement back to the beginning of the school year if the parent timely applies to the COH and the child is in a private school necessary to implement his IEP (Ex. # 2, Dep. at 145). And *see* Decision of the Commissioner # 10201, February 29, 1980 (reimbursement allowed where school district has failed to provide an appropriate placement and the child has been placed in an approved school).

The Court concludes for the foregoing reasons that declaratory and injunctive relief is appropriate with respect to the 50% discrepancy rule and the removal of residential schools from the approved list. Accordingly, it is hereby ORDERED that:

1. the 50% discrepancy rule and the elimination of residential schools from the Commissioner's approved list are declared violative of federal law;

2. defendants are directed forthwith to cease enforcement of the 50% discrepancy rule and to restore the approved list as in effect on June 30, 1979;

3. the cases of the individual plaintiffs are remanded to the local committees on the handicapped for prompt re-evaluation, in accordance with this opinion, of their classifications and educational placements;

4. defendant Ambach is directed forthwith to inform the local school districts of

change in the number of handicapped children between 1977–78 and 1978–79 (Ex. # 2, Dep. at 26).

**26.** In light of the Supreme Court's decision in *Edelman, supra*, the argument that plaintiffs are seeking "equitable restitution" rather than damages is unpersuasive. The Court stated that the retroactive award of government benefits "is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in this action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." 415 U.S. at 668, 94 S.Ct. at 1358.

this Court's Order, together with instructions that the local COH's forthwith inform all parents of children who have sought classification and placement in the past year of the terms of this Order.

The Clerk is directed to notify the parties of the entry of this Memorandum Decision and Order. The parties are directed to appear at a status conference on July 21, 1980, at 4:30 p.m. in Courtroom No. 6, United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York, to schedule a date for trial of the issues raised by plaintiffs' complaint which remain to be determined.

SO ORDERED.